## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| J.R., a minor by and through his mother and general guardian Eden Hope Rodriguez,<br><br>　　　Plaintiff,<br><br>　　　　v.<br><br>HARRISON SCHOOL DISTRICT TWO; WENDY BIRHANZEL, Superintendent, Harrison School District Two, in her official and personal capacities;  MIKE CLAUDIO, Assistant Superintendent of Personnel Support Services, Harrison School District Two, in his official and personal capacities; CHEYENNE MOUNTAIN CHARTER ACADEMY d/b/a THE VANGUARD SCHOOL; RENEE HENSLEE, Executive Director, The Vanguard School, in her official and personal capacities; JEFF YOCUM, Director of Operations, The Vanguard School, in his official and personal capacities; and BETH DANJUMA, Assistant Principal, The Vanguard School, in her official and personal capacities,<br><br>　　　Defendants. | No. <u>1:23-cv-2769</u><br><br>**COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

J.R., a minor, by and through his parent and general guardian, Eden Hope Rodriguez, brings this complaint to vindicate his rights under the First and Fourteenth Amendments to the United States Constitution.

## **INTRODUCTION**

1.　　J.R. is an extraordinary young man—only twelve years old, yet willing to stand up for what he believes, and willing to speak his mind in the face of inappropriate official censure.  Some individuals at his public school disagree with J.R.'s views, finding them

distasteful and worthy of suppression.  J.R. believes in traditional values such as limited

government, personal freedom, and the right of individuals to secure their self-defense through

means such as firearms ownership.  These are all views that are decidedly out of vogue in certain

elite circles.

2.     Officials at J.R.'s public school are, of course, entitled to their opinions.  They are

even entitled to attempt to persuade J.R. and others that traditional views are mistaken.  They are

not, however, allowed to use their positions of power to shut students up, suppress their beliefs,

and prevent them from peacefully sharing their views.

3.     But that is exactly what the government servants who run J.R.'s public school

have done.  The adults who should have been nurturing J.R.'s impulse to express himself—even

if they respectfully disagreed with his views—instead repeatedly censored his speech on

increasingly flimsy pretexts.

4.     The Supreme Court held more than fifty years ago that a student's free speech

rights may not be denied unless a school can point to a well-founded fear that his expression will

substantially disrupt the school day, such as engaging in lewd speech or speech that advocates

drug use.  Courts may also suppress disruptive protests, such as those that drag students out of

class to chant loud slogans in the hallway, making learning all but impossible for others.

5.     Initially, Defendants banned J.R. from expressing his support for gun rights.

J.R.'s support for Second Amendment rights, expressed silently through humorous patches

affixed to his backpack, carried zero risk of substantial disruption—as school officials well knew

since J.R. had been wearing the same or similar patches for years without incident.  Accordingly,

Defendants not only violated J.R.'s First Amendment rights, but did so in an obvious way.

6.      Defendants next took the absurd stance that a patch on J.R.'s backpack depicting

the famous "DONT TREAD ON ME" flag flown around the time of the American Revolutionary

War in the 1770s and 1780s could not be seen in school because of its alleged "roots in slavery,"

and because of its alleged "links" to contemporary political movements.  So great was the

aversion of school administrators to this symbol (officially known as the "Gadsden Flag," after

its creator) that the school claimed it could not "[be] around other kids," as if radioactive or

infectious.

7.      An image of the Gadsden Flag follows, here:



8.      This too, was an obvious and inexcusable violation of J.R.'s right to freedom of

speech.  Again, Defendants had no evidence whatsoever from which to conclude that a silent,

peaceful display of a miniature Gadsden Flag on a backpack would cause substantial disruption

to the school day.  Indeed, all of the evidence pointed in the opposite direction, including that

J.R. had worn the same or similar patches for years, without disturbances at school.

9.      But, even worse, Defendants' pretextual reason for banning J.R.'s speech—that

the Gadsden Flag carries a pro-slavery or "white supremacist" message—was not only wrong as

a matter of history, but was based entirely on highly-questionable left-wing political advocacy.

Public schools are not "enclaves of totalitarianism," where school officials indoctrinate students

in a particular set of beliefs, particularly on contested political and moral questions, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969); and schools may not gin up controversy as a pretext to ban a well-known historical symbol based on fashionable re-interpretations pushed by modern day partisans.

10.     Often, government silencing of speech, especially in the context of public schools, flies under the radar, and goes unnoticed by the wider society.  However, this time was an exception.  Defendants' casual acts of censorship did not remain a private matter between a student and his school.  Instead, a video that captured a school administrator articulating exactly why the school was censoring the Gadsden Flag made its way to social media platforms, where it quickly "went viral," leading to widespread condemnation of Defendants' conduct.

11.     Even the Governor of the State of Colorado weighed in publicly to disagree with Defendants' rash and indefensible decision.

12.     In the sudden glare of public attention, Defendants quickly engaged in damage control, issuing a statement that purported to give J.R. back his right to display the Gadsden Flag (but not any of his other patches).  Even that move, however, was a cynical one—Defendants have only temporarily rescinded their ban on the Gadsden Flag, and have threatened to reimpose it as soon as anyone, including any staff member, "complains," a virtual certainty once this matter fades from the headlines.

13.     J.R. brings this lawsuit to vindicate his clearly established First Amendment right to free speech, and in order to send a message that government schools may not ban the expression of ideas merely because they find them disagreeable.

## PARTIES

14.    J.R. is a minor, under the age of eighteen, and is the natural-born son of his mother and general guardian Eden Hope Rodriguez.  J.R. and Ms. Rodriguez are residents of Colorado Springs, Colorado.  J.R. is currently a seventh-grade student at Cheyenne Mountain Charter Academy d/b/a The Vanguard School ("The Vanguard School"), a public charter school authorized by the Harrison School District Two public school district.

15.    Defendant Harrison School District Two ("School District" or the "District") is a duly organized school district in the State of Colorado with responsibility for the oversight and operation of local public and charter schools, including The Vanguard School.  Harrison School District Two is a body corporate, authorized by state law to sue and be sued.  *See* Colo. Rev. Stat. § 22-32-101.  Harrison School District Two is not an arm of the State of Colorado.

16.    Defendant Wendy Birhanzel is the Superintendent of Harrison School District Two. In that position, she has the authority to promulgate and enforce district-wide policies, including policies governing student dress and other forms of expression.  Defendant Birhanzel has supervisory authority over the other individual Defendants.  She is sued in both her official and individual capacities.

17.    Defendant Mike Claudio is the Assistant Superintendent of Personnel Support Services at Harrison School District Two.  In that position, he has the authority to promulgate and enforce district-wide policies, including policies governing student dress and other forms of expression.  He is sued in both his official and individual capacities.

18.    Defendant Cheyenne Mountain Charter Academy d/b/a The Vanguard School ("The Vanguard School") is a K-12 charter school located in Colorado Springs.  The Vanguard

School is a public school operating with Harrison School District Two and has "the same public status as a public school that is geographically located in the same school district." Colo. Rev. Stat. Ann. §§ 22-30.5-104 & 104.9. The Vanguard School is not an arm of the State of Colorado.

19.     Defendant Renee Henslee is the Executive Director of The Vanguard School. In that position, she has the authority to promulgate and enforce school policies, including policies governing student dress and other forms of expression. Defendant Henslee has supervisory authority over Vanguard School personnel, including the other individual Vanguard School Defendants. She is sued in both her official and individual capacities.

20.     Defendant Jeff Yocum is the Director of Operations of The Vanguard School. In that position, he has the authority to promulgate and enforce school policies, including policies governing student dress and other forms of expression. He is sued in both his official and individual capacities.

21.     Defendant Beth Danjuma is an Assistant Principal of The Vanguard School. In that position, she has the authority to promulgate and enforce school policies, including policies governing student dress and other forms of expression. She is sued in both her official and individual capacities.

22.     All Defendants were acting under color of state law at all time relevant hereto. All Defendants are "persons" for purposes of 42 U.S.C. § 1983.

## **JURISDICTION AND VENUE**

23.     Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 & 1988 and 28 U.S.C. § 2201 for deprivations of Plaintiff's rights secured by the First and Fourteenth Amendments to the United States Constitution.

24.     This Court has jurisdiction over this complaint under 28 U.S.C. § 1343, which provides for original jurisdiction in this Court for suits brought pursuant to 42 U.S.C. § 1983. The Court also has jurisdiction under 28 U.S.C. § 1331 because this matter arises under the Constitution and laws of the United States.

25.     Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district. On information and belief, venue is also appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are residents of the state of Colorado and of this district.

## STATEMENT OF FACTS

### Defendants' Policies

26.     Pursuant to Colo. Rev. Stat. § 22-32-109.1, as part of their responsibility to keep public school students safe, school districts in Colorado must adopt dress code policies that prohibit students from wearing apparel that is "disruptive to the classroom environment or to the maintenance of a safe and orderly school."

27.     Defendant School District has adopted a policy purportedly in compliance with this directive (the "Dress Code"), designated "JICA" in the District's policy manual. A true and correct copy of the Dress Code is attached hereto as Exhibit 1.

28.     The Dress Code asserts, "[t]he District recognizes that students have a right to express themselves through dress and personal appearance." Exhibit 1, at 1.

29.     Nevertheless, a key provision of the code flatly prohibits students from displaying "any . . . symbols, words, slogans, patches, or pictures that . . . [r]efer to . . . weapons" (the "Reference to Weapons Policy"). *Id.*

30.     The Reference to Weapons Policy prohibits any expression "refer[ring]" to weapons whatsoever, without any consideration of the definition of a weapon (such as cannons, baseball bats, swords, magic wands, etc.), or whether the particular expression could reasonably be deemed disruptive to the classroom environment, or the maintenance of a safe and orderly school.

31.     The Reference to Weapons Policy is extremely overbroad.  For example, the policy, on its face, bars students from expressing messages in favor of, in opposition to, or even in a neutral posture with respect to the issue of gun control.  As another example, the policy bars students from displaying images of United States currency such as the one dollar bill which contain "pictures" or "symbols" of weapons such as shields and arrows.

32.     The Reference to Weapons Policy in the Dress Code is placed on par with other speech prohibitions, such as prohibitions on expressions "of a sexual nature," expressions that "denote membership in gangs," speech that is "obscene, profane, vulgar, lewd, or legally libelous," speech that "[r]efer[s] to drugs, tobacco, [or] alcohol," and speech that "[t]hreaten[s] the safety or welfare of any person."  *Id.*

33.     Student expression that refers to weapons in a way that also, for example, "threatens the safety" of other persons or that "denotes membership in gangs," would be prohibited under these other provisions.  Put simply, the Reference to Weapons Policy does not provide any independent protection for student safety that does not already exist under these other provisions.

34.     The Dress Code also contains a catch-all provision forbidding any "apparel that is deemed disruptive or potentially disruptive to the classroom environment or to the maintenance of

a safe and orderly school." (The "Catch-All Provision"). *Id.* This provision captures expression that is not otherwise specifically prohibited by other parts of the Code.

35. The Dress Code does not set forth any standards governing application of the Catch-All Provision.

36. The Dress Code applies to The Vanguard School.

37. Students found to be in violation of the Dress Code are subject to significant punishment, including disciplinary removal from their classrooms, detention, loss of privileges, and other penalties. *See* Harrison Sch. Dist. Two Policy Manual, Policies JKBA & JKBA-R, attached as Exhibit 2; Harrison Sch. Dist. Two Code of Conduct 2023-2024, attached as Exhibit 3 at 13-14 (discipline matrix).

38. Students at The Vanguard School regularly express themselves through the display of "symbols, words, slogans, patches or pictures." For example, students regularly display patches or other accessories concerning lesbian, gay and bisexual students. Additionally, students regularly display patches or other accessories expressing views on the topic of climate change.

39. Defendants have not attempted to prohibit such expression under the Dress Code or any other policy.

40. Staff and faculty at The Vanguard School also regularly express themselves through the display of "symbols, words, slogans, patches or pictures." For example, staff members prominently display bumper stickers with strong political and other messages on automobiles

parked on school property.  An image depicting such staff speech follows:



41.    Defendants have not attempted to prohibit such expression.  Defendants have not deemed any such expression to be "disruptive or potentially disruptive" to the school environment.

**<u>Plaintiff Exercises his Free Speech Rights</u>**

42.    J.R. proudly identifies himself as a patriotic American.  J.R. believes in limited government, constitutional principles, and personal freedom.

43.    J.R. and his family engage in sport-shooting and are firearms enthusiasts.  J.R. is a strong believer in Second Amendment-protected rights.  He further believes that responsible personal possession of firearms is a social good, and can help reduce crime and foster self-reliance.

44.    Despite his age, J.R. is also a student of history, with a focus on the founding era, the Revolutionary War, and other topics.  He believes that the American founding, even with its flaws, was a key turning point for human flourishing and liberty.  He believes in the message of

the Gadsden Flag, which he takes to be a statement of resistance to governmental overreach generally and a reaffirmation of individual freedoms.

45.    J.R. further believes (correctly) that he has the constitutional right to speak up and express his beliefs in public, including at his public school.

46.    J.R. has shared and will continue to share his beliefs through the display of political slogans, images, and other expressions on various patches affixed to his backpack.

47.    Every day, J.R. wears patches on his backpack that express his beliefs, including his deeply held beliefs about self-defense, government, and his values.

48.    At the beginning of the 2023-24 school year, J.R.'s backpack contained approximately a dozen patches, including:

  a. A monochrome American flag patch;

  b. Several patches depicting Pac Man ghosts and other comical characters holding firearms (the "Ghost Patches");

  c. A patch displaying the words "Firearms Policy Coalition Official Member" and an image of a firearm (the "FPC Patch");

  d. A patch displaying the Dogecoin cryptocurrency logo, and another with the words "Bear Arms N' Bitcoin 2020";

  e. A display of a person wearing an ATF cap looking over a wall; and

  f. A patch containing an image of a coiled snake displayed on a red field over the words "DONT TELL ON ME" which is a parody of the famous "DONT TREAD ON ME" Gadsden Flag (the "Parody Flag Patch")

49.     A photograph of J.R.'s backpack as it appeared during the first week of the 2023-24 school year is depicted here:



50.     As explained more fully below, J.R. later removed a number of these patches pursuant to Defendants' orders.  J.R. replaced the removed patches with a number of different patches and displays, including:

    a.     A patch depicting a traditional Gadsden Flag – a coiled snake on a yellow field over the words "DONT TREAD ON ME" (the "Gadsden Flag Patch");

b.  A homemade banner reading "J-Rod 4 VP Revolution," which J.R. wore to indicate his intent to run for the office of Vice President of his class at The Vanguard School (the "Campaign Banner"); and

c.  Patches depicting Saint Michael—an important religious symbol in various faiths—holding a sword.

51.  Photographs of these patches follow, here:





52.     J.R. sought to convey various messages through both his choice of specific patches to display and through the overall organization and arrangement of these elements on his backpack.

53.     Among other things, the FPC Patch reflects J.R.'s support for and membership in an nonprofit corporation known as the Firearms Policy Coalition (an IRC § 501(c)(4)) that advocates for vigorous protection of Second Amendment and other freedoms.[1]

54.     The message that J.R. sought to convey with the Ghost Patches was multi-faceted. On one level, the patches are a humorous nod to J.R.'s views on the social utility of responsible firearm ownership, and his support for Second Amendment-protected freedoms.  On another level, they reflect playfulness, which is particularly appropriate because J.R. is 12 years old, and because he and his family engage in marksmanship as a sport.  On yet another level, they constitute a visual

---

[1] *See* Reilly, Hull, and Allen, *IRC 501(c)(4) Organizations, Exempt Organizations Technical Instruction Program for FY 2003* (2003), at https://www.irs.gov/pub/irs-tege/eotopici03.pdf

play on words by pairing "ghosts" with "guns," to reference his support for the right of Americans to self-manufacture defensive weapons--sometimes labeled "ghost guns" by gun restriction advocates.

55.     Through display of the Gadsden Flag Patch, J.R. sought to communicate his bedrock political view that government should "stay in its lane" and be limited to strictly necessary functions, so as to protect individual freedoms.  One of J.R.'s messages is that government should not overreach—i.e., should not "tread on"—J.R. or any other American.

56.     The Parody Flag Patch carried another multi-level message.  First, it echoed the Gadsden Flag in design and visual elements, thus reinforcing J.R.'s general political philosophy. Second, through the text "Dont Tell on Me," J.R. sought to communicate through humor that he takes a stand of resistance to all forms of unfair social control.

57.     The other patches and banners each convey messages in their own right.  And the overall arrangement and display of patches on J.R.'s backpack carries a message about who J.R. is, his political commitments, and his embrace of certain values (including free speech values).

58.     None of these messages is inherently threatening.

59.     None of these messages has been or will be displayed in a threatening manner.

60.     None of these messages advocates for illegal conduct.

61.     None of these messages advocates for violence in any respect.

62.     None of these messages is lewd, profane, indecent, vulgar, or obscene.

63.     Although he rotates his patches from time to time, J.R. has generally displayed the same dozen or so patches or similar patches on his backpack for a number of years, including the 2022-23 school year, when he was enrolled in sixth grade at The Vanguard School, the 2021-22

school year, when he was enrolled in fifth grade at The Vanguard School, the 2020-21 school year,

when he was enrolled in fourth grade at a public school in Texas, and the 2019-20 school year,

when he was enrolled in third grade at a public school in Texas.

64.     J.R.'s patches did not cause any disruptions inside or outside school or in any way

impede the educational mission of The Vanguard School during the 2022-23 or 2021-22 school

years, much less cause a substantial disruption.

65.     J.R.'s patches did not cause any disruptions inside or outside school, or in any way

impede the educational mission of the Texas public school that J.R. attended during the 2020-21

or 2019-20 school years, much less cause a substantial disruption.

66.     There have never been any incidents involving J.R.'s display of images or messages

referring to weapons that have resulted in any disruption whatsoever.

67.     There have never been any incidents involving J.R.'s display of images related to

the Gadsden Flag, or its variants, that have resulted in any disruption whatsoever.

68.     On information and belief, there have never been any incidents of students other

than J.R. displaying images or messages similar to J.R.'s that refer to weapons that resulted in any

disruption, much less substantial disruption, at The Vanguard School.

69.     On information and belief, there have never been any incidents of students other

than J.R. displaying images or messages related to the Gadsden Flag or its variants that resulted in

any disruption, much less substantial disruption, at The Vanguard School.

**August 2023 – Defendants Repeatedly Censor J.R.'s Speech**

70.     Although Defendants had allowed J.R. to display his patches for several years, without any disruption whatsoever to the functioning of The Vanguard School, they suddenly and inexplicably changed course at the beginning of the 2023-24 school year.

71.     On or around August 18, 2023, less than a week after the start of the new school year, J.R. was summoned to the principal's office by Defendant Danjuma, and informed that an unidentified staff member had allegedly complained that his patches were inappropriate in some unspecified way.  To date, Defendants have not identified the person making this complaint.

72.     As a result of the alleged complaint, J.R. removed the Ghost Patches from his backpack, but retained the FPC Patch and the Parody Flag Patch.

73.     On Monday, August 21, 2023, J.R. was again summoned to the principal's office in reference to his patches.  This time, Defendant Yocum explained Defendants' view that the FPC patch was forbidden under the Reference to Weapons Policy.  While admitting that the FPC Patch was not disruptive, and that the school did not consider J.R. to represent a threat to anyone, Mr. Yocum opined that the "images themselves are considered not safe to be in schools."

74.     In that meeting, Defendant Yocum did not object to the Parody Flag Patch, which was on J.R.'s backpack at the time.

75.     Defendant Yocum stated that he understood that there were potentially free speech concerns at play, and that he would discuss the matter with counsel for the District and/or The Vanguard School, and would get back to J.R. and his family with an official determination on the propriety of J.R.'s expression within a matter of days.

76.     In an August 23, 2023 e-mail, Defendant Yocum relayed Defendants' official determination that J.R. was barred from displaying the FPC Patch.  In a surprise move, Defendant Yocum also stated that J.R. was barred from displaying the Parody Flag Patch, which had not previously been discussed.  A copy of the August 23, 2023 e-mail from Defendant Yocum is attached as Exhibit 4.

77.     Defendant Yocum stated that he had consulted the school's attorney, as well as Defendant District.  Defendant Yocum asserted that the patches were being barred because they could allegedly "be deemed disruptive or potentially disruptive to the classroom environment." He did not provide any further explanation.  Exhibit 4, at 1.

78.     Defendant Yocum instructed that if J.R. did not remove the FPC Patch and the Parody Flag Patch, he would not be allowed to attend classes.  Defendants did not object to the other patches on J.R.'s backpack at the time.  *Id.*

79.     Because he believed Defendants' order violated the First Amendment, J.R. did not immediately remove the FPC and Parody Flag Patches.

80.     On Friday, August 25, 2023, Defendant Henslee sent e-mails to Ms. Rodriguez reiterating Defendants' demand that J.R. remove the FPC and Parody Flag Patches, and threatening that "[i]f he returns to school with any unacceptable patches, he will be sent to the front office until they are removed."  A copy of the August 25, 2023 e-mail exchange between Defendant Henslee and Ms. Rodriguez is attached as Exhibit 5.

81.     Pursuant to Defendants' orders, J.R. removed the FPC and Parody Flag Patches from his backpack.

82.    Partially to protest the censorship that he suffered, J.R. then added the traditional Gadsden Flag Patch and two Saint Michael patches.  J.R. had already added the Campaign Banner reading "J-Rod 4 VP Revolution," to his backpack.  In response to the unfair treatment by his school, J.R. had determined to run for the position of Vice President of his class in The Vanguard School student government organization.

83.    On Monday, August 28, 2023, J.R. returned to school, having removed all of the patches Defendants previously barred.  *See supra* ¶ 51 (image of J.R.'s backpack on August 28, 2023).

84.    Not satisfied, Defendants again pulled J.R. out of class into the principal's office, this time solely due to the Gadsden Flag Patch.

85.    Ms. Rodriguez was called to an emergency meeting at the school, during which Defendant Danjuma relayed that the District Superintendent (Defendant Birhanzel) had determined that the Gadsden Flag was unacceptable under the Dress Code.

86.    The sole rationale for Defendants' ban on display of the Gadsden Flag was, in Defendant Danjuma's words, "due to its origins [in] slavery and the slave trade."  Defendant Danjuma further stated "we can't have [the Gadsden Flag] in and around other kids."

87.    Ms. Rodriguez explained that the Gadsden Flag was not a pro-slavery flag and that its true significance was that it was used during the American War of Independence against the British monarchy in the 1770s and 1780s.  Defendant Danjuma did not provide a substantive response.

88.     Another Vanguard School official in the room during the emergency meeting admitted that he did not associate the Gadsden Flag with a pro-slavery message, and that he did not think the patch was "racist."

89.     Ms. Rodriguez made a video recording of the August 28, 2023 meeting.  A copy of the recording is attached as Exhibit 6.

90.     J.R. was not allowed to return to class for the remainder of the day.

91.     After the school day had ended, Defendant Yocum followed up by e-mail to elaborate on Defendants' justification for barring display of the Gadsden Flag.  In his e-mail, Defendant Yocum cited to articles by advocates arguing that the Gadsden Flag was "[t]ied to" various contemporary political movements disfavored by the articles' authors.  The articles, in turn, decried the purported link between the Gadsden Flag and such things as "hard-line Republican anti-tax movement[s]," and "political protests . . . opposing restrictions on gun ownership and objecting to rules imposed in 2020 to slow the spread of the coronavirus."  Some of the articles also noted that the originator of the Flag, Christopher Gadsden, owned slaves and was involved in the slave trade in the 18th Century.  According to Defendant Yocum, in the present day, the flag is also "tied to" what he called "'Patriot' groups" and "other white-supremacy [and . . .] hate groups."  A copy of the August 28, 2023 e-mail from Defendant Yocum with copies of the referenced articles is attached as Exhibit 7.

92.     Plaintiff, of course, does not agree that the Gadsden Flag is a symbol of white supremacy or "hate" or is "tied to" any of the ills imagined by Defendants and the authors of the cited articles.

93.    Defendants' nefarious interpretation of the Gadsden Flag is decidedly unusual.  The

Gadsden Flag is widely viewed not as a symbol of "hate" or other distasteful viewpoints, but as a

proud historical symbol of resistance to oppression.

94.    Indeed, several states offer Gadsden Flag license plates such as the one depicted

here:



According to Wikipedia, as of 2022, twelve states offered such license plates: Alabama, Arizona,

Florida, Kansas, Maryland, Missouri, Montana, Oklahoma, South Carolina, Tennessee, Texas,

and Virginia.[2]

---

[2] https://en.wikipedia.org/wiki/Gadsden_flag#Modern_use (last visited Oct. 19, 2023)

95.    And, the symbolism of the Gadsden Flag is frequently incorporated into everyday life, including (as one example) on US Soccer jerseys, as depicted below:



96.    Given that there are competing possible interpretations of the meaning of the Gadsden Flag, Defendant Yocum did not explain why Defendants relied almost exclusively on articles that were obviously meant as political advocacy of a particular point of view.

97.    Defendant Yocum did not explain why Defendants had not sought input from unbiased or neutral professional historians, or others who may have had expertise on the meaning of the Gadsden Flag.

98.    Defendant Yocum did not explain why Defendants failed to ask J.R. what he meant by displaying the Gadsden Flag, or whether his intent was "white supremacist" in nature.

99.    Defendant Yocum did not explain the basis for Defendants' apparent assumption that the Gadsden Flag would be interpreted by students at The Vanguard School to be a symbol tied to "white supremacy" and "hate," as opposed to the much more likely interpretation that the

Gadsden Flag was a symbol tied to the American Revolutionary War that also represents contemporary political views in favor of limited government, or that students would not have an emotional response to the flag at all.

100.    Defendant Yocum noted that he had been coordinating with Defendant Claudio, an Assistant Superintendent employed by Defendant School District.

101.    In an e-mail response to Defendant Yocum, Ms. Rodriguez noted the absurdity of Defendants' position, writing:

> Everything can be considered racist and tied to white supremacy. It's sad because when everything becomes racist then nothing is. And that's a problem for people of color like me. When we actually need to cry racism and oppression and it's actually happening no one will take it seriously. I think making everything racist is racist lol. I'll type in random things I see from the school and type in racist? In the google search bar and let's see what I can come up with. Air …Racist? Math Definitely racist, as a person of color I agree. Totally racist. Roads. I hate traffic. Roads are definitely racist. Church. Food. Water. The American flag. Wow the American flag . . . is used by hate groups. Gotta get rid of that on campus too. What a doozie.

August 28, 2023 e-mail from Eden Hope Rodriguez, attached as Exhibit 8 (citations omitted; cleaned up).

102.    Defendants did not make an assessment that the display of the Gadsden Flag would be likely to disrupt the educational environment at The Vanguard School.

103.    There is no evidence that Defendants' ban of the Gadsden Flag was necessary or helpful in maintaining discipline or an effective learning environment at The Vanguard School.

104.    Indeed, given that J.R. had worn this and other similar patches for several years, entirely without incident, all of the available evidence pointed in the opposite direction.

105.    Defendants did not make an assessment that the display of the Parody Flag Patch would be likely to disrupt the educational environment at The Vanguard School.

106.    There is no evidence that Defendants' ban of the Parody Flag Patch was necessary or helpful in maintaining discipline and an effective learning environment at The Vanguard School.

107.    Indeed, given that J.R. had worn this and other similar patches for several years, entirely without incident, all of the available evidence pointed in the opposite direction.

108.    Defendants did not make an assessment that the display of the FPC Patch would be likely to disrupt the educational environment at The Vanguard School.

109.    There is no evidence that Defendants' ban of the FPC Patch was necessary or helpful in maintaining discipline or an effective learning environment at The Vanguard School.

110.    Indeed, given that J.R. had worn this and other similar patches for several years, entirely without incident, all of the available evidence pointed in the opposite direction.

111.    Defendants did not make an assessment that display of the Ghost Patches would be likely to disrupt the educational environment at The Vanguard School.

112.    There is no evidence that Defendants' ban of the Ghost Patches was necessary or helpful in maintaining discipline or an effective learning environment at The Vanguard School.

113.    Indeed, given that J.R. had worn this and other similar patches for several years, entirely without incident, all of the available evidence pointed in the opposite direction.

### Media Exposure of Defendants' Misconduct Causes Them to Temporarily Backtrack on Some, but not all, of their Censorship

114.    On August 29, 2023, the morning following Defendants' most egregious act of censorship concerning the Gadsden Flag, Ms. Rodriguez sought an emergency meeting with

Defendant Claudio at District headquarters to discuss the matter. She was repeatedly informed, however, that Defendant Claudio could not meet with her.

115.    In the meantime, video of the prior day's meeting was circulated on social media, including on the platform X (formerly Twitter), quickly leading to local, national and even international news reports covering Defendants' ban of the Gadsden Flag on the laughable basis that it had "roots in slavery." Media coverage and public mockery on social media fueled the spread of the video. Needless to say, the reaction to Defendants' conduct was overwhelmingly negative.

116.    Indeed, the Governor of the State of Colorado expressed his personal disagreement with Defendants' actions, posting on X:



117.    A partial list of news reports covering the August 28, 2023 ban on J.R.'s Gadsden Flag Patch is provided in Exhibit 9.

118.    On information and belief, Defendants were surprised and dismayed by the public response to their censorship.

119.    Due to the exposure of Defendants' conduct, The Board of Directors of The Vanguard School held an emergency meeting the same day, and determined to change course in

an attempt to quell rising public outrage. The Vanguard School Board issued a statement "recogniz[ing] the historical significance of the Gadsden flag and its place in history." The statement also asserted that "[a]t this time, the Vanguard School Board and the District have informed the student's family that he may attend school with the Gadsden flag patch visible on his backpack." A copy of the public statement is attached as Exhibit 10.

120.    Contrary to this public statement, however, the only person who contacted Ms. Rodriguez was Defendant Claudio, an employee of Defendant District. No representative of The Vanguard School has communicated with Ms. Rodriguez regarding the Gadsden Flag patch to date.

121.    Moreover, Defendant Claudio has never provided assurances that J.R. would be free from further censorship targeting the Gadsden Flag Patch. To the contrary, Defendant Claudio explicitly reserved the right to once again bar display of the patch. Defendant Claudio informed Ms. Rodriguez that Defendants were temporarily allowing J.R. to wear the patch, stating they would continue to allow the patch "until [they receive a complaint] from [a] student or staff member."

122.    Defendants have not lifted their ban on the FPC Patch, the Ghost Patches, or the Parody Flag Patch.

123.    With respect to the Gadsden Flag Patch, Defendants only lifted their ban under the intense public pressure that came with media exposure and public mockery, including pressure from the Governor of Colorado. Even then, Defendants have only temporarily suspended their ban, conditional on anyone—including staff—"complaining" about it, which is almost certain to

happen once this event fades from the headlines since it was staff that created this controversy in the first place.

124.    Defendants' actions have had a chilling effect on J.R.'s right to freely and openly express his beliefs.  And because of Defendants' enforcement of the Dress Code, J.R. cannot reasonably predict whether certain expression will be allowed at school, or whether he will be subject to discipline.

## August 2023 to the Present -- Defendants Commit Additional Ongoing Constitutional Violations by Retaliating Against J.R.

125.    Following Defendants' misconduct and the subsequent media exposure, other students at The Vanguard School have verbally and physically harassed J.R.  On information and belief, these students have interpreted the actions of Defendants as a license to mistreat J.R.  These students have also expressed that they are upset with J.R., not because of the messages displayed on his backpack, but because of the negative public reaction to Defendants' own misconduct in banning J.R.'s exercise of his free speech rights.

126.    These students' ire is inappropriately aimed at J.R., rather than at Defendants.  Had Defendants respected J.R.'s First Amendment right to display the patches at issue—which they had done without incident for the prior two years—there would have been no controversy and no harassment of J.R.

127.    Defendants have compounded their misconduct by failing to intervene to address other students' harassment and intimidation of J.R., despite being informed of these incidents and having the opportunity and authority to do so.

128.    J.R. has also reported to school officials that other students have stolen his patches, including the Gadsden Flag patch shown in the viral video, from his backpack during school hours. Defendants, however, have failed to investigate or intervene to prevent or redress this misconduct.

**Plaintiff Suffered Injuries as a Result of Defendants' Unconstitutional Conduct**

129.    Plaintiff suffered irreparable harm as a result of Defendants' conduct.  The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

130.    Moreover, given the facial overbreadth of the Dress Code, Plaintiff has been, and continues to be chilled in his ability to express through patches, accessories or otherwise, sentiments that "refer to weapons" in any way.

131.    Plaintiff has also suffered emotional and pecuniary harm as a direct result of the suppression of his First Amendment rights.

132.    Plaintiff has also suffered from a loss of educational opportunities due to being pulled out of class on multiple occasions in order to face interrogation in the principal's office, all in violation of his constitutional rights.  Defendants have recognized that "[s]tudent removal from class is a serious measure and should not be imposed in an arbitrary, casual or inconsistent manner."  Harrison Sch. Dist. Two Policy JKBA, Exhibit 2, at 1.

133.    Plaintiff suffered damages in an amount to be determined at trial as a result of Defendants' conduct described herein.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**(Against Defendants Birhanzel in her personal capacity, Claudio, in his personal capacity, Henslee, in her personal capacity, Yocum, in his personal capacity, and Danjuma, in her personal capacity)**

AS-APPLIED VIOLATION OF PLAINTIFF'S RIGHT TO FREE SPEECH UNDER THE FIRST AND FOURTEENTH AMENDMENTS – DAMAGES

134.    Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

135.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  The Fourteenth Amendment incorporates the guarantees of the First Amendment and makes them enforceable against states and localities. *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1217 (10th Cir. 2021).

136.    For more than half a century, it has been "unmistakabl[y]" clear that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506 (1969).  Plaintiff's display of the Gadsden Flag, Parody Flag, Ghost and FPC Patches (collectively, the "Patches") on his backpack constituted protected First Amendment speech.  *See, e.g.*, *id.* at 505 (equating student display of political symbols to "pure speech" triggering the highest level of First Amendment protection).

137.    School officials may never suppress protected student speech out of a mere "desire to avoid . . . discomfort[,] unpleasantness[, or] controversy." *Id.* at 509-10.  Instead, pursuant to *Tinker*, a school official may only prohibit speech that he or she has reason to believe will "materially and substantially disrupt the work and discipline of the school." *Id.* at 513.

138.    A school administrator's concern that speech will cause substantial disruption must be "well-founded." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 212 (3d Cir. 2001) (Alito, J.).

139.    In order for a concern of substantial disruption to be "well-founded," it must be based on "past disruptive incidents arising out of [similar] speech." *Newsom ex rel. Newsom v. Albemarle Co. Sch. Bd.*, 354 F.3d 249, 259 n.7 (4th Cir. 2003); *see also id.* ("In the absence of past incidents, courts have concluded that school authorities have failed to establish a sufficient likelihood of disruption to support the ban on speech." (citations omitted)); *Saxe*, 240 F.3d at 211; *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366 (10th Cir. 2000) (school officials' predictions that the display of a confederate battle flag would result in racially-motivated student-on-student fighting were well founded, because similar incidents occurred during prior school years).

140.    J.R.'s display of the Patches did not create material disruption or cause substantial disorder.

141.    Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma did not make an individualized assessment that the display of the Patches would be likely to create material disruption or substantial disorder in the future.

142.    Even if they had predicted that J.R.'s patches would cause a disruption, any such prediction would not be well-founded.

143.    Indeed, not only were there no "past incidents [of disruption] arising out of similar speech," *Saxe*, 240 F.3d at 212, but J.R. had worn the very same or similar patches to school during

the 2022-23, 2021-22, 2020-21, and 2019-20 school years without even a single incident of disruption, much less substantial disruption.

144.     While the Supreme Court has outlined "three specific categories of student speech" that schools may regulate even without a showing of substantial disruption under *Tinker, Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2045 (2021), none of them apply here. Those categories are (1) juvenile outbursts of indecent, lewd, and vulgar speech that are incompatible with the speaker developing into a mature adult, delivered to a captive audience of young persons, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 678, 685 (1986); (2) speech promoting "illegal drug use," *Morse v. Frederick*, 551 U.S. 393, 409 (2007); and (3) speech that others may reasonably perceive as bearing the school's imprimatur, such as speech carried by a school newspaper, *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988).

145.     Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma did not assert that the Patches were subject to regulation under the *Fraser* "indecent, lewd and vulgar" standard, the *Morse* promotion of illegal drugs standard, or the *Hazelwood* school-sponsored speech standard.

146.     Nor could they.  There is nothing indecent, lewd, or vulgar about any of the Patches; they do not promote the use of illegal drugs; and no reasonable person would perceive J.R.'s display to bear the imprimatur of the school.

147.     Moreover, Defendants may not now assert any of these non-*Tinker* justifications for censoring Plaintiff's speech, as no such justification was articulated at the time they made their decision.  *See, e.g.*, *Norris on behalf of A.M. v. Cape Elizabeth Sch. Dist.*, 929 F.3d 12, 25-27 (1st Cir. 2020) (due to the danger of abuse, school officials may not rely on *post hoc* rationalizations of their prior decisions and must rely solely on "rationales for student speech restrictions that were

. . . articulated at the time their decision was made.") (*citing, inter alia, Summum v. City of Ogden*, 297 F.3d 995, 1005-06 (10th Cir. 2002)).  At the time that Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma made their decision to censor the Patches, the only ground advanced was that the Patches could allegedly "be deemed disruptive or potentially disruptive to the classroom environment."

148.    Separately, Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma violated the First Amendment for the independent reason that they engaged in unlawful content discrimination.  The First Amendment generally prohibits "content discrimination," which occurs when government officials regulate speech based on its subject matter.

149.    Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma engaged in impermissible content discrimination when they barred J.R.'s display of the Patches because the prohibition targets particular subjects: symbols that are purportedly "tied to" various political movements and beliefs, symbols allegedly "rooted" in historical practices that have long since been outlawed, and pro-gun messages.  Prohibiting such expression is not narrowly tailored because it prohibits all such expression, without regard to whether the expression may be prohibited under *Tinker* and its progeny.

150.    Defendants also violated the First Amendment for the independent reason that they engaged in unlawful viewpoint discrimination.  "Viewpoint discrimination is an egregious form of content discrimination and is presumptively unconstitutional."  *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (cleaned up, citation omitted).

151.    Defendants engaged in impermissible viewpoint discrimination by barring J.R.'s display of the Patches while allowing other students to display their political views at school.

152.    The true reason J.R. has been and is prohibited from sharing pro-gun-rights and pro-freedom messages was that staff at The Vanguard School and the District disagree with J.R.'s points of view, which they find distasteful.  Because J.R.'s political views are deemed antithetical to Defendants' own anti-gun and pro-government-control views, J.R. was falsely painted as "racist."

153.    Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma did not act under conditions requiring split-second decision-making, or under conditions implicating public safety concerns.  Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma had ample time to educate themselves on the parameters of the First Amendment, and indeed consulted legal counsel. Accordingly, there is no justification for applying the doctrine of qualified immunity to these Defendants' acts.

154.    Even if qualified immunity were applicable in a First Amendment case like this one, it would not protect Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma, because they had fair notice that their conduct violated J.R.'s clearly established First Amendment rights.

155.    Any reasonable government official surveying the legal landscape in August 2023 would have known that barring the display of the Patches in the absence of evidence establishing a likelihood of disruption to the educational environment was unconstitutional.

156.    Any reasonable government official surveying the legal landscape in August 2023 would have known that barring display of the Patches based on their content was unconstitutional.

157.    Any reasonable government officially surveying the legal landscape in August 2023 would have known that barring display of the Patches based on the viewpoint expressed, real or imagined, was unconstitutional.

158.    Any reasonable government official in 2023 would know that, as a factual matter, imposing a complete prohibition on displaying the Gadsden Flag would lead to absurd results.

159.    J.R.'s rights were clearly established at the time of Defendants' infringement.

160.    Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma are directly liable for their violations of Plaintiff's First Amendment rights as described herein.  Plaintiff is entitled to an award of compensatory damages against these Defendants in an amount to be proven at trial.

161.    Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma's acts were done in reckless disregard of Plaintiff's constitutional rights because they acted with the intent to suppress Plaintiff's non-threatening, non-disruptive, non-profane political expression.

162.    An award of compensatory or nominal damages would be insufficient to deter further acts by Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma in violation of J.R.'s and other students' constitutional rights.

163.    Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma.

## SECOND CLAIM FOR RELIEF

### (Against Defendants School District and The Vanguard School)

#### AS-APPLIED VIOLATION OF PLAINTIFF'S RIGHT TO FREE SPEECH UNDER THE FIRST AND FOURTEENTH AMENDMENTS – DAMAGES – *MONELL* CLAIM

164.    Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

165.    The actions of Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma violated Plaintiff's constitutional rights for the reasons stated in the First Claim For Relief.

166.    Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma acted pursuant to an official policy, practice and custom of Defendant School District and Defendant The Vanguard School.  The individual Defendants repeatedly confirmed that their multiple acts of censorship were approved by Defendants School District and The Vanguard School, consistent with legal counsel's advice, and were in furtherance of School District and Vanguard School policy.

167.    The policies of Defendant School District and The Vanguard School to prohibit pro-gun and anti-government political messages was the moving force behind the First Amendment violations committed by Defendants Birhanzel, Claudio, Henslee, Yocum and Danjuma.

168.    As a direct and proximate result of the policy, practice, and custom of Defendants School District and The Vanguard School to suppress speech as described in this complaint, Plaintiff was and continues to be deprived of his constitutional right to freedom of speech. Accordingly, Plaintiff is entitled to damages from Defendants School District and The Vanguard School.

### THIRD CLAIM FOR RELIEF

**(Against Defendants School District, The Vanguard School, Birhanzel, in her official capacity, Claudio, in his official capacity, Henslee, in her official capacity, Yocum, in his official capacity, and Danjuma, in her official capacity)**

**AS-APPLIED VIOLATION OF PLAINTIFF'S RIGHT TO FREE SPEECH UNDER THE FIRST AND FOURTEENTH AMENDMENTS – INJUNCTIVE AND DECLARATORY RELIEF**

169.    Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

170.    Defendants School District, The Vanguard School, Birhanzel, in her official capacity, Claudio, in his official capacity, Henslee, in her official capacity, Yocum, in his official

capacity, and Danjuma, in her official capacity violated and will in the future violate Plaintiff's

First Amendment rights as set forth in the First Claim for Relief and the Second Claim for Relief.

171.    Plaintiff suffered irreparable harm as a result of Defendants' conduct.  The "loss of

First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

172.    The harm to Plaintiff is ongoing.  Defendants have never rescinded their ban on

Plaintiff's display of any patches other than the Gadsden Flag patch.  Accordingly, Plaintiff

continues to be barred from displaying the Ghost Patches, the FPC Patch and the Parody Flag

patch.  Moreover, Defendants have threatened to re-institute their ban on the Gadsden Flag patch

immediately upon receipt of any "complaints" from any student or staff member.  Plaintiff

reasonably believes that Defendants will re-institute the Gadsden Flag patch as soon as this matter

fades from the headlines.

173.    Plaintiff has no adequate legal, administrative, or other remedy by which to prevent

or minimize the continuing irreparable harm to his First Amendment rights.

174.    Defendants would not be harmed by the issuance of injunctive relief prohibiting

them from violating Plaintiff's constitutional rights.

175.    The public interest would be served by the issuance of injunctive relief in this

matter because "upholding constitutional rights serves the public interest."  *Newsom ex rel.*

*Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *see also Homans v. City*

*of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) ("[T]he public interest is better served by

following binding Supreme Court precedent and protecting the core First Amendment right of

political expression").  In addition, because schools have an affirmative "duty to teach students

that freedom of speech, including unpopular speech, is essential to our form of self-government," *Mahanoy*, 141 S. Ct. at 2049 (Alito, J. concurring), the public interest would be doubly-served by holding Defendants to account.

176. Plaintiff is entitled to a declaration under 28 U.S.C. § 2201 that Defendants School District, The Vanguard School, Birhanzel, in her official capacity, Claudio, in his official capacity, Henslee, in her official capacity, Yocum, in his official capacity, and Danjuma, in her official capacity violated Plaintiff's First Amendment rights as set forth in the First Claim for Relief and the Second Claim for Relief.

177. To the extent that Defendants' assert that Plaintiff's claim is moot because they have permitted J.R. to wear the Gadsden Flag patch, Defendants' assertion fails under the doctrine of voluntary cessation. Defendants have neither established that it is absolutely clear that the violation will not re-occur, or that they have irrevocably eradicated the effects of their prior violations.

## FOURTH CLAIM FOR RELIEF

### (Against Defendants School District and The Vanguard School)

#### FACIAL FIRST AMENDMENT CHALLENGE TO REFERENCE TO WEAPONS POLICY – OVERBREADTH – INJUNCTIVE AND DECLARATORY RELIEF

178. Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

179. Defendants School District and The Vanguard School have promulgated and enforced the Dress Code, which contains a provision referred to herein as the Reference to

Weapons Policy.   The Reference to Weapons Policy is overbroad, in violation of the First Amendment.

180.    A rule is overbroad in violation of the First Amendment if "a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks, citation omitted).

181.    The Reference to Weapons Policy prohibits all student messages that "refer to . . . weapons."

182.    This provision is unconstitutionally overbroad because it prohibits a vast array of constitutionally protected expression wholly out of proportion to its legitimate sweep, if any.

183.    For example, on its face, the prohibition on references to weapons would prohibit a pro-gun-control patch or bracelet.

184.    The policy would prohibit a message referencing the "sword of Damocles."

185.    The policy would prohibit a patch displaying the United States dollar bill due to the fact that it contains an image of an eagle clutching a bundle of arrows.

186.    The policy would prohibit displaying any number of coins commemorating the contributions of service members in historical armed conflicts that depict weapons.

187.    The policy would prohibit display of the official seal of the State of Colorado, which includes images of a battle axe and a shield.  *See* https://archives.colorado.gov/collections/symbols-emblems/state-seal (last visited Oct. 12, 2023).

188.    The policy would prohibit students from wearing Arsenal Football Club jerseys, which portray a cannon on them.

189.    The policy would prohibit students from wearing or displaying images of Harry Potter characters wielding magic wands.

190.    The policy would prohibit all of these instances of protected speech, and many more, without regard to any specific assessment that such speech may be reasonably anticipated to cause substantial disruption to the educational mission of The Vanguard School.  Put another way, the policy would prohibit vast quantities of speech in violation of the standards set forth in *Tinker* and its progeny.

191.    While one can conceive of very limited circumstances under which application of the policy would satisfy the *Tinker* standard, such as to bar the display of a weapons-related patch in a manner has historically led to actual student-on-student conflict, or other substantial disruption, these potentially legitimate applications of the policy are dwarfed by the much more numerous unconstitutional applications.

192.    The Reference to Weapons Policy is so overbroad that it chills a substantial amount of constitutionally protected speech, including peaceful, non-disruptive displays that reference weapons.

193.    The policy contains no effective limiting principle to constrain the overbroad application of its terms.

194.    As a direct and proximate result of the rule and its enforcement, Plaintiff will suffer irreparable injury from the violation of his constitutional rights because the rule is overbroad and chills a substantial amount of Plaintiff's protected speech.

195.    Plaintiff is entitled to preliminary and permanent injunctive relief, including but not limited to an order enjoining Defendants from enforcing the Reference to Weapons Policy.

196.    Plaintiff is also entitled to a declaration pursuant to 28 U.S.C. § 2201 that the Reference to Weapons Policy is substantially and unlawfully overbroad on its face and therefore violates the First Amendment.

## FIFTH CLAIM FOR RELIEF

## (Against All Defendants)

### FIRST AMENDMENT VIOLATION – RETALIATION FOR ENGAGING IN PROTECTED FREE SPEECH ACTIVITY

197.    By displaying the Gadsden Flag, Parody Flag, Ghost and FPC Patches on his backpack, Plaintiff engaged in constitutionally protected activity.

198.    Defendants' suppression of Plaintiff's free speech rights and the ensuing publicity have inspired other students at The Vanguard School to harass Plaintiff, to steal Plaintiff's property, and to take other action out of a displaced sense of grievance.

199.    Defendants have compounded their misconduct by failing to intervene to protect Plaintiff from these acts of other students, despite having the opportunity and authority to do so.

200.    Defendants' failure is ongoing and is sufficiently adverse that it would chill a person of ordinary firmness from engaging in the First Amendment protected activity of peacefully displaying pro-gun and anti-government patches.

201.    Defendants' actions were substantially motivated as a response to Plaintiff's exercise of his free speech rights.

202.    Based on these retaliatory acts, Defendants have violated Plaintiff's First Amendment Rights.

203.    Plaintiff has suffered and continues to suffer irreparable injury as a direct result of Defendants' retaliatory conduct.

204.    Plaintiff has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to his First Amendment rights.

205.    Defendants would not be harmed by the issuance of injunctive relief prohibiting them from violating Plaintiff's constitutional rights.

206.    The public interest would be served by the issuance of injunctive relief in this matter because "upholding constitutional rights serves the public interest." *Newsom*, 354 F.3d at 261 (4th Cir. 2003); *Homans*, 264 F.3d at 1244.  In addition, because schools have an affirmative "duty to teach students that freedom of speech, including unpopular speech, is essential to our form of self-government," *Mahanoy*, 141 S. Ct. at 2049 (Alito, J. concurring), the public interest would be doubly-served by holding Defendants to account.

207.    Plaintiff is entitled to a declaration under 28 U.S.C. § 2201 that Defendants violated Plaintiff's First Amendment rights as set forth in this Fifth Claim for Relief.

208.    Any reasonable government official surveying the legal landscape would know that retaliating against Plaintiff for the exercise of his First Amendment rights was unconstitutional.

209.    Plaintiff's rights were clearly established at the time of Defendants' infringement.

210.    Plaintiff is entitled to an award of damages against each Defendant named in his or her individual capacity in an amount to be proven at trial.

## RELIEF REQUESTED

Plaintiff respectfully requests that this Court:

A.      Enter a declaratory judgment that Defendants violated Plaintiff's First Amendment rights by interpreting and enforcing the dress code to prohibit the display of the Patches;

B.      Enter preliminary and permanent injunctions prohibiting Defendants from enforcing the dress code to prohibit display of the Patches or any similar expressive images;

C.      Enter a declaratory judgment that the Reference to Weapons Policy is facially invalid due to overbreadth;

D.      Enter preliminary and permanent injunctions prohibiting Defendants from enforcing the facially invalid Reference to Weapons Policy;

E.      Enter preliminary and permanent injunctions prohibiting Defendants from retaliating against Plaintiff for the exercise of his constitutional rights, including by failing to intervene to protect Plaintiff from harassment and intimidation of other students and failing to investigate the theft of Plaintiff's property;

F.      Order Defendants to expunge any negative disciplinary records related to the incidents at issue;

G.      Award Plaintiff equitable relief in the form of compensatory education and tutorial services for instructional hours missed due to the Defendants' constitutional violations;

H.      Award Plaintiff equitable relief in the form of expunging any affected grades or reversing other educational consequences that resulted from Defendants' unconstitutional conduct.

I.      Retain jurisdiction of this matter for the purpose of enforcing the Court's orders;

J.      Enter an award of compensatory damages against Defendants School District, The Vanguard School, Birhanzel in her personal capacity, Claudio, in his personal capacity, Henslee, in her personal capacity, Yocum, in his personal capacity, and Danjuma, in her personal capacity;

K.      Enter an award of punitive damages against Defendants Birhanzel, in her personal capacity, Claudio, in his personal capacity, Henslee, in her personal capacity, Yocum, in his personal capacity, and Danjuma, in her personal capacity;

L.      Enter an award of attorneys' fees and costs of suit against all Defendants pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 54; and

M.      Order such other and further relief as the Court may deem just, proper and necessary under the circumstances.

**JURY DEMAND**

Plaintiff requests a trial by jury on all issues and claims so triable.


DATED this 23rd day of October 2023.          Respectfully submitted,

*/s/ James Kerwin*
James Kerwin, CO Bar #57545
William E. Trachman, CO Bar #45684
MOUNTAIN STATES LEGAL
FOUNDATION
2596 S. Lewis Way
Lakewood, Colorado 80227
Tele: (303) 292-2021
Fax: (877) 349-7074
jkerwin@mslegal.org
wtrachman@mslegal.org

John C. Eastman
Anthony T. Caso
CONSTITUTIONAL COUNSEL GROUP
1628 N Main St #289
Salinas, CA 93906
Tele: (909) 257-3869
Fax: (714) 844-4817
jeastman@ccg1776.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF COLORADO

*J.R. v. Harrison School District Two, et al.*

INDEX OF EXHIBITS TO COMPLAINT

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 1. | **Harrison School District Two Policy Manual, Policy JICA** |
| 2. | **Harrison School District Two Policy Manual, Policies JKBA & JKBA-R** |
| 3. | **Harrison School District Two Code of Conduct 2023-2024** |
| 4. | **August 23, 2023 Email from Jeff Yocum to Eden Rodriguez** |
| 5. | **August 25, 2023 Email Exchange Between Renee Henslee and Eden Rodriguez** |
| 6. | **Conventionally Submitted Video Recording of August 28, 2023 Meeting at The Vanguard School** |
| 7. | **August 28, 2023 Email from Jeff Yocum to Eden Rodriguez and Referenced Articles** |
| 8. | **August 28, 2023 Email from Eden Rodriguez to Jeff Yocum** |
| 9. | **Partial List of News Reports Covering Defendants' Censorship of the Gadsden Flag and other Patches** |
| 10. | **August 29, 2023 Message from The Vanguard School Board to Vanguard Families** |