# EXHIBIT 7

On Mon, Aug 28, 2023 at 4:46 PM Jeff Yocum <jeff.yocum@thevanguardschool.com> wrote:

Ms. Rodriguez,

As discussed, I am providing you the rationale for determining the Gadsen Flag is considered an unacceptable symbol:

First case when EEOC required the complaint to be reviewed.

https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/08/03/wearing-dont-tread-on-me-insignia-could-be-punishable-racial-harassment/

Tied to the Confederate flag and other white-supremacy groups, including "Patriot" groups.

https://www.oregonlive.com/politics/2021/01/dont-tread-on-me-flag-widely-flown-by-capitol-mob-has-complex-history.html

Tied to hate groups.

https://theconversation.com/symbols-of-white-supremacy-flew-proudly-at-the-capitol-riot-5-essential-reads-153055

Decision by the Navy in 2016 to not fly or wear the Gadsden flag.

https://www.military.com/kitup/2016/08/navys-dont-tread-on-me-patch-avoids-race-controversy.html

We truly hope to have Jaiden back at school tomorrow to resume his normal school day, but that will require this patch to be removed from his backpack. I have been coordinating with Dr. Michael Claudio,

Assistant Superintendent, Personnel Support Services (HSD2).  He understands you may reach out to him regarding this issue.  His office number is (719) 579-2018 and his email is mclaudio@hsd2.org.

Sincerely,


Jeff Yocum

Director of Operations

719-471-1999 x 252

www.TheVanguardSchool.com

This article was published more than **7 years ago**

### The Washington Post

THE VOLOKH CONSPIRACY

# Wearing 'Don't Tread on Me' insignia could be punishable racial harassment



By Eugene Volokh

August 3, 2016 at 5:26 p.m. EDT

[UPDATE: For a follow-up post, see Harvard law prof: "Saying at work that 'Hillary Clinton shouldn't be president because women shouldn't work full-time' may lead to a harassment lawsuit", which responds to a Harvard law professor's defense of the EEOC decision that I discuss below.]

The Equal Employment Opportunity Commission, among its other functions, decides "hostile work environment" harassment claims brought against federal agencies. In doing so, it applies the same legal rules that courts apply to private employers, and that the EEOC follows in deciding whether to sue private employers. The EEOC has already ruled that coworkers' wearing Confederate flag T-shirts can be punishable harassment (a decision that I think is incorrect); and, unsurprisingly, this is extending to other political speech as well. Here's an excerpt from *Shelton D. [pseudonym] v. Brennan*, 2016 WL 3361228, decided by the EEOC two months ago:

> On January 8, 2014, Complainant filed a formal complaint in which he alleged that the Agency subjected him to discrimination on the basis of race (African American) and in reprisal for prior EEO activity when, starting in the fall of 2013, a coworker (C1) repeatedly wore a cap to work with

an insignia of the Gadsden Flag, which depicts a coiled rattlesnake and the phrase "Don't Tread on Me."

Complainant stated that he found the cap to be racially offensive to African Americans because the flag was designed by Christopher Gadsden, a "slave trader & owner of slaves." Complainant also alleged that he complained about the cap to management; however, although management assured him C1 would be told not to wear the cap, C1 continued to come to work wearing the offensive cap. Additionally, Complainant alleged that on September 2, 2013, a coworker took a picture of him on the work room floor without his consent. In a decision dated January 29, 2014, the Agency dismissed Complainant's complaint on the basis it failed to state a claim . . . .

Complainant maintains that the Gadsden Flag is a "historical indicator of white resentment against blacks stemming largely from the Tea Party." He notes that the Vice President of the International Association of Black Professional Firefighters cited the Gadsden Flag as the equivalent of the Confederate Battle Flag when he successfully had it removed from a New Haven, Connecticut fire department flagpole.

After a thorough review of the record, it is clear that the Gadsden Flag originated in the Revolutionary War in a non-racial context. Moreover, it is clear that the flag and its slogan have been used to express various non-racial sentiments, such as when it is used in the modern Tea Party political movement, guns rights activism, patriotic displays, and by the military.

However, whatever the historic origins and meaning of the symbol, it also has since been sometimes interpreted to convey racially-tinged messages in some contexts. For example, in June 2014, assailants with connections to white supremacist groups draped the bodies of two murdered police officers with the Gadsden flag during their Las Vegas, Nevada shooting spree. [Footnote: Shooters in Metro ambush that left five dead spoke of white supremacy and a desire to kill police, Las Vegas Review-Journal, June 8, 2014, available online at: http://www.reviewjournal.com/news/las-vegas/shooters-metro-ambush-left-five-dead-spoke-white-supremacy-and-desire-kill-police.] Additionally, in 2014, African-American New Haven firefighters complained about the presence of the Gadsden flag in the workplace on the basis that the symbol was racially insensitive. [Paul Bass, Flag Sparks Fire Department Complaint, New Haven Independent, Feb. 25, 2014, available online at:http://www.newhavenindependent.org/index.php/archives/entry/tea_party_fire_department/.] Certainly, Complainant ascribes racial connotations to the symbol based on observations that it is sometimes displayed in racially-tinged situations.

> In light of the ambiguity in the current meaning of this symbol, we find that Complainant's claim must be investigated to determine the specific context in which C1 displayed the symbol in the workplace. In so finding, we are not prejudging the merits of Complainant's complaint. Instead, we are precluding a procedural dismissal that would deprive us of evidence that would illuminate the meaning conveyed by C1's display of the symbol.

A few thoughts:

1. Recall that this is *not* a case about when private employers *may* restrict what their employees wear on the job, or even about when government employers may do so. Private employers have very broad power on this, because they aren't bound by the First Amendment (though statutes in some states may constrain employers' power to some extent). Government employers also have fairly broad power to restrict their employees' on-the-job speech and behavior.

Instead, this is a case about the rules that all employers, public or private, *must* follow, on pain of massive legal liability. The harassment law rules (which, as I noted, are the same for private employers as for the federal government) are imposed by the government acting as sovereign — the area where the First Amendment should provide the most protection — not just the government acting as employer.

2. Nothing in the opinion suggests that the cap wearer said anything racist to Shelton D.; I've read many such EEOC decisions, and they generally list all the significant allegations of harassment. (I can't access the specific complaint in the case, because all that information is kept secret in EEOC proceedings.) Shelton D.'s objection was apparently just to the wearing of the flag, and the ideology that he thinks has become associated with the flag. And the claim that the EEOC is allowing to go forward is simply that the cap, in some social or workplace "context" would be reasonably seen as conveying a racially offensive message.

3. Let's think about how this plays out in the workplace. Imagine that you are a reasonable employer. You don't want to restrict employee speech any more than is necessary, but you also don't want to face the risk of legal liability for allowing speech that the government might label "harassing." An employee comes to you, complaining that a coworker's wearing a "Don't Tread on Me" cap — or having an "All Lives Matter" bumper sticker on a car parked in the employee lot, or "Stop Illegal Immigration" sign on the coworker's cubicle wall — constitutes legally actionable "hostile environment harassment," in violation of federal employment law. The employee claims that in "the specific context" (perhaps based on what has been in the news, or based on what other employees have been saying in lunchroom conversations), this speech is "racially tinged" or "racially insensitive."

Would you feel pressured, by the risk of a lawsuit and of liability, into suppressing speech that expresses such viewpoints? Or would you say, "Nope, I'm not worried about the possibility of liability, I'll let my employees keep talking"? (Again, the question isn't what you *may* do as a matter of your own judgment about how you would control a private workplace; the question is whether *the government* is pressuring you to suppress speech that conveys certain viewpoints.)

4. Now let's get to the 2016 election campaign. Say someone wears "Trump/Pence 2016" gear in the workplace, or displays a bumper sticker on his car in the work parking lot, or displays such a sign on his cubicle wall, or just says on some occasions that he's voting for Trump. He doesn't say any racial or religious slurs about Hispanics or Muslims, and doesn't even express any anti-Hispanic or anti-Muslim views (though even such views, I think, should be protected by the First Amendment against the threat of government-imposed liability).

But in "context," a coworker complains, such speech conveys a message "tinged" with racial or religious hostility, or is racially or religiously "insensitive." The coworker threatens to sue. Again, say you are an employer facing such a threat. Would you feel pressured by the risk of liability to restrict the pro-Trump speech? (As before, the question isn't whether you'd be inclined to do that yourself, whether from opposition to Trump, or a desire to avoid controversy that might harm morale; because the First Amendment doesn't apply to private employers, private Internet service providers, private churches, private universities, private landlords, or others, they are not constitutionally constrained from restricting speech. The question is whether you would feel pressured by the government to impose such restrictions, through the threat of being forced to pay money in a civil lawsuit if you don't impose them — and whether the government should be able to pressure such private organizations or individuals to restrict speech this way.)

"There is a place for political discussion in our country, but it shouldn't be the workplace. Accordingly, you may want to consider adopting policies that prohibit political discussions and expression in your workplace, consistent with the applicable state and federal requirements." So writes one employment lawyer, in the Virginia Employment Law Letter. Other employment law experts have likewise urged employers to broadly restrict speech, including speech about presidential politics (that happened with regard to talk about the Clinton/Lewinsky matter).

And while the Virginia Employment Letter proposal would at least be a viewpoint-neutral restriction (though a very broad one), employers are in practice more likely to come down on speech that expresses viewpoints that might trigger harassment claims — such as calls to elect candidates who want to build a wall on the Mexican border, or limit immigration from Muslim countries — than on speech that expresses contrary viewpoints. Workplace harassment law has become a content-based, viewpoint-based speech restriction, including on core political speech. A pretty serious First Amendment problem, I think, for reasons I discuss in more detail here.

# 'Don't Tread On Me' flag, widely flown by Capitol mob, has complex history

Published: Jan. 07, 2021, 11:47 a.m.



Crowds of people gather as President Donald Trump speaks to supporters from The Ellipse near the White House on January 6, 2021. (Photo by MANDEL NGAN/AFP via Getty Images)AFP via Getty Images

**By The Conversation**

**By Paul Bruski, Associate Professor of Graphic Design, Iowa State University**

Flown by many protesters at the U.S. Capitol on Jan. 6, the Gadsden flag has a design that is simple and graphic: a coiled rattlesnake on a yellow field with the text "Don't Tread On Me." But that simple design hides some important complexities, both historically and today, as it appears in rallies demanding President Donald Trump be allowed to remain in office.

The flag originated well before the American Revolution, and in recent years it has been used by the tea party movement and, at times, members of the militia movement. But it has also been used to represent the U.S. Marine Corps, the U.S. Navy, the U.S. men's national soccer team and a Major League Soccer franchise.

As a scholar of graphic design, I find flags interesting as symbols as they take on deeper meanings for those who display them. Often, people use a flag not because of what is explicitly displayed, but because of what the person believes it represents – though that meaning can change through time, and with one's perspective, as has happened with the Gadsden flag.

**The beginning of a myth**
The flag's origin isn't entirely clear. It seems to begin with a simple illustration accompanying an essay by Benjamin Franklin in 1754, 20 years before American independence. The image, possibly drawn by Franklin himself, portrays the American Colonies as parts of a divided snake, simply stating "Join, or Die." The essay it accompanied addressed the major current issue for British colonists in North America: the threat of the French and their Native American allies.

Later, as the American Revolution took shape, the image took on a new meaning. Colonists hoisted various flags, including ones depicting rattlesnakes, a distinctly American creature believed to strike

only in self-defense. The flag commonly known as the "First Navy Jack" had 13 red and white stripes, and possibly a timber rattlesnake with 13 rattles, above the words "Don't Tread On Me."

In 1775, as the American Revolution began, South Carolina politician Christopher Gadsden expanded on Franklin's idea, and possibly the red-and-white flag as well, when he created the yellow flag with a coiled rattler and the same phrase: "Don't Tread On Me."

Gadsden was a slave owner and trader, who built Gadsden's Wharf in Charleston, South Carolina, which was a major slave-trading site. As many as 40% of enslaved Africans who were brought to the U.S. first arrived there. The site is slated to be the home of the International African American Museum, which estimates that 150,000 captured Africans came through the wharf, and that between 60% and 80% of today's African Americans can trace an ancestor to the trade there.



Jeremy Christian flashed this 'Don't Tread On Me' sticker or sign during a pre-trial hearing on Nov. 15, 2017. Christian appeared to be directing his attention toward Micah Fletcher, who was seated in the courtroom gallery. (Beth Nakamura/The Oregonian)

### A symbol awoken
For most of U.S. history, this flag was all but forgotten, though it had some cachet in libertarian circles.

The First Navy Jack version resurfaced in 1976 on U.S. Navy ships to celebrate the nation's bicentennial, and again after 9/11, though today that flag is reserved for the longest active-status warship. Its use remained largely apolitical.

In 2006 the slogan and the coiled snake saw some commercial use by Nike and the Philadelphia Union, a Major League Soccer team.

Around the same time, though, the flag took on a new political meaning: The tea party, a hard-line Republican anti-tax movement, began using it. The implication was that the U.S. government had become the oppressor threatening the liberties of its own citizens.



A "Don't Tread On Me" patch is seen on the jacket of Joey Gibson, leader of Patriot Prayer. The Patriot Prayer movement's march for Kathryn Steinle was interrupted by Rose City Antifa in downtown Portland Saturday, Dec. 9, 2017. Both groups clashed, sometimes violently, while marching from Chapman Square to the waterfront and back. Mark Graves/Staff LC- Mark GravesLC- Mark Graves

Perhaps as a result of the tea party movement, several state governments around the country offer a Gadsden flag license plate design. At least some of those plates charge additional fees for the special plate, sending proceeds to nonprofit organizations.

The Gadsden flag has appeared at other political protests, too, such as those opposing restrictions on gun ownership and objecting to rules imposed in 2020 to slow the spread of the coronavirus. Most recently the flag has been flown and displayed at some post-election protests, including events where demonstrators called for officials to stop counting votes – and both inside and outside the Capitol building in Washington, D.C., during the counting of the electoral votes on Jan. 6.

Because of its creator's history and because it is commonly flown alongside "Trump 2020" flags, the Confederate battle flag and other white-supremacist flags, some may now see the Gadsden flag as a symbol of intolerance and hate – or even racism. If so, its original meaning is then forever lost, but one theme remains.

At its core, the flag is a simple warning – but to whom, and from whom, has clearly changed. Gone is the original intent to unite the states to fight an outside oppressor. Instead, for those who fly it today, the government is the oppressor.

# Symbols of white supremacy flew proudly at the Capitol riot – 5 essential reads

Published: January 15, 2021 8.22am EST

**Author**



1. **Jeff Inglis**
Freelance Editor, The Conversation US

**Interviewed**



1. **Jonathan D. Sarna**
University Professor and Joseph H. & Belle R. Braun Professor of American Jewish History, Brandeis University

2.  **Jordan Brasher**
Assistant Professor of Geography, Columbus State University

3.  **Long T. Bui**
Associate Professor of Global and International Studies, University of California, Irvine

4.  **Paul Bruski**
Associate Professor of Graphic Design, Iowa State University

5.  **Tom Birkett**
Lecturer in Old English, University College Cork

**Partners**

View all partners

Many Americans are trying to gain a deeper understanding of what was behind the riot at the U.S. Capitol on Jan. 6 and, most importantly, why it happened.

At The Conversation, we asked several scholars who study symbols – including ancient Norse images and more recent flags from U.S. history – to explain what they saw during the riot, and what those symbols mean.

Reading their work, it's inescapable that white supremacy is a common thread connecting many of the different groups who converged on Washington that day. Here are five articles from The Conversation's recent coverage, explaining what many of the symbols mean.



A man carries the Confederate battle flag in the U.S. Capitol on Jan. 6, between portraits of senators who both opposed and supported slavery. Saul Loeb/AFP via Getty Images

## 1. The Confederate battle flag

Perhaps the most recognized symbol of white supremacy was the Confederate battle flag.

**Don't let yourself be misled. Understand issues with help from experts**

Get the newsletter

"Since its debut during the Civil War, the Confederate battle flag has been flown regularly by white insurrectionists and reactionaries fighting against rising tides of newly won Black political power," writes Jordan Brasher at Columbus State University, who has studied how the Confederacy has been memorialized.

He notes that in one photo from inside the Capitol, the flag's history came into sharp relief, as the man carrying it was standing between "the portraits of two Civil War-era U.S. senators – one an ardent proponent of slavery and the other an abolitionist once beaten unconscious for his views on the Senate floor."



Gadsden flags fly at the Capitol on Jan. 6, 2021. Bill Clark/CQ-Roll Call, Inc via Getty Images

## 2. The yellow Gadsden flag

Another flag with a racist history is the "Don't Tread On Me" flag. It was designed by slave owner and trader Christopher Gadsden when the American Revolution began, as Iowa State University graphic design scholar Paul Bruski writes.

"Because of its creator's history and because it is commonly flown alongside 'Trump 2020' flags, the Confederate battle flag and other white-supremacist flags, some may now see the Gadsden flag as a symbol of intolerance and hate – or even racism," he explains.

It has been adopted by the tea party movement and other Republican-leaning groups, but the flag still carries the legacy, and the name, of its creator.



A gallows symbolizing the lynching of Jews was among the hate symbols carried as crowds stormed the U.S. Capitol on Jan. 6 in Washington, D.C. Shay Horse/NurPhoto via Getty Images

## 3. Powerful anti-Semitism

Another arm of white supremacy doesn't target Blacks. Instead, it demonizes Jewish people. And there were plenty of anti-Semitic symbols on display during the riot, as Jonathan D. Sarna explains.

He is a Brandeis University scholar of American anti-Semitism, and describes the ways that "[c]alls to exterminate Jews are common in far-right and white nationalist circles." That included a gallows erected outside the Capitol, evoking a disturbing element of a 1978 novel depicting the takeover of Washington, D.C., along with mass lynchings and slaughtering of Jews.



A man known as Jake Angeli, who has been arrested for his role in the Capitol riot, wears a horned hat and tattoos of Norse images. Saul Loeb/AFP via Getty Images

## 4. Co-opted Norse mythology

Among the most striking images of the riot were those of a man wearing a horned hat and no shirt, displaying several large tattoos. He is known as Jake Angeli, but his full name is Jacob Chansley, and he has been arrested for his role in the riot.

Tom Birkett, a lecturer in Old English at University College Cork in Ireland, explains that many of the symbols Chansley wears are from Norse mythology. However, he explains, "these symbols have also been co-opted by a growing far-right movement," and Chansley appears – from other tattoos he wears – to be among them.

Birkett traces the use of Norse symbols back to the Nazis, and points out that they are a form of code hidden in plain sight: "if certain symbols are hard for the general public to spot, they are certainly dog whistles to members of an increasingly global white supremacist movement who know exactly what they mean."



The yellow-and-red striped flag of the defeated American-backed Republic of Vietnam flies at the U.S. Capitol insurrection Jan. 6. Tayfun Coskun/Anadolu Agency via Getty Images

## 5. An outlier, of sorts

Another flag was prominent at the Capitol riot, one that doesn't strictly represent white supremacy: the flag of the former independent country of South Vietnam.

But Long T. Bui, a global studies scholar at the University of California, Irvine, explains that when flown by Vietnamese Americans, many of whom support Trump, the flag symbolizes militant nationalism:

"[S]ome Vietnamese Americans view their fallen homeland as an extension of the American push for freedom and democracy worldwide. I have interviewed Vietnamese American soldiers who fear American freedom is failing," he explains.

*Editor's note: This story is a roundup of articles from The Conversation's archives*

# Navy's 'Don't Tread on Me' Patch Avoids Race Controversy



9 Aug 2016

In the wake of an Equal Employment Opportunity Commission decision that found that workplace display of the Gadsden Flag, with its coiled snake and "Don't Tread on Me" slogan, could constitute racial harassment, the Navy has authorized wear of a patch depicting a snake and the same slogan for all troops who wear the Navy's woodland-patterned camouflage working uniform.

But despite their similarities, the two images have a very different history. Critics of the Gadsden Flag, designed by Christopher Gadsden in 1775 and more recently used as a rallying image for the right-wing Tea Party movement, say the flag's separate use by white supremacist groups makes its display racially insensitive. By contrast, the Navy patch, featuring an uncoiled snake on a striped background, is based on the First Naval Jack, also designed in 1775 but used historically for only Navy purposes. In 2002, then-Navy Secretary Gordon England authorized all Navy warships and auxiliaries to fly the flag during the "Global War on Terrorism."

"The Navy is not authorized to fly or wear the Gadsden flag," a spokeswoman for Navy Personnel Command, Lt. Jessica Anderson, told Military.com.

The Navy's patch had its own moment of controversy in 2013, when a former Navy SEAL wrote in the conservative publication The Daily Caller that active-duty Navy SEALs had been ordered

to remove the patch from their uniforms. The report was picked up some steam before it was investigated and [debunked by the Navy.](#) Officials would later call the dustup the result of an "[honest mistake](#)" by a senior enlisted sailor.

Anderson said the Navy had opted to authorize the patch for all sailors who wear Navy woodland and desert camouflage as the Navy's woodland camouflage replaces the much-maligned ["blueberries" blue digital print](#) as the primary working form for the service.

"We're going to a uniform that can have patches, and people are going to ask the question," Anderson said.

The new rules authorize the Don't Tread on Me patch on the right shoulder and the reverse U.S. flag patch on the left with the NWU Type II and III desert and woodland uniforms.

"Sailors have been requesting the authority to wear the patches to show their esprit de corps," Anderson said.  "Navy has been working with Navy Exchange Command and Natick Textile Engineers to complete the development of the new patch and build sufficient inventory."

Related Topics: [KitUp](#)

*© Copyright 2023 Military.com. All rights reserved. This article may not be republished, rebroadcast, rewritten or otherwise distributed without written permission. To reprint or license this article or any content from Military.com, please submit your request [here](#).*