IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No.: 1:23-cv-02769-SKC-MDB

J.R., a minor, by and through his mother and general guardian,
EDEN HOPE RODRIGUEZ

     Plaintiff,

v.

HARRISON SCHOOL DISTRICT TWO, *et al.*,

     Defendants.

---

## ORDER RE: THREE MOTIONS TO DISMISS (DKTS. 51, 52 & 53)

---

Plaintiff J.R. is a minor and student at Defendant Cheyenne Mountain Charter Academy d/b/a the Vanguard School (the "School"), a charter school chartered by Defendant Harrison School District Two (the "District"). At the start of the 2023-24 school year, school officials pulled J.R. out of classes for displaying various patches on his backpack that included the Gadsden flag and different representations of firearms. This lawsuit ensued.

The Amended Complaint ("AC") (Dkt. 43) alleges violations of J.R.'s First Amendment rights against the School, the District, and several of their respective officials (in their official and individual capacities), and seeks damages, declaratory judgment, and injunctive relief.

The matter is now before the Court on three motions to dismiss filed by different groups of the Defendants. The District and Defendants Wendy Birhanzel (Superintendent) and Mike Claudio (Assistant Superintendent) filed one motion to dismiss ("District MTD"). Dkt. 53. The School filed the second motion to dismiss ("School MTD") with Defendants Renee Henslee (Executive Director) and Jeff Yocum (Director of Operations).[1] Dkt. 51. And, Defendant Beth Danjuma (former Assistant Principal) filed the last motion to dismiss ("Danjuma MTD"). Dkt. 52. The following chart summarizes J.R.'s claims against each Defendant alleged in the AC:

| CLAIM | DEFENDANTS |
|---|---|
| **First Claim:** As-Applied Violation of Right to Free Speech under the First and Fourteenth Amendments – Damages | Birhanzel, individually<br>Claudio, individually<br>Henslee, individually<br>Yocum, individually<br>Danjuma, individually |
| **Second Claim:** As-Applied Violation of Right to Free Speech under the First and Fourteenth Amendments – Damages – *Monell* Claim[2] | District<br>School |
| **Third Claim:** As-Applied Violation of Right to Free Speech under the First and Fourteenth Amendments – Injunctive & Decl. Relief | District<br>School<br>Birhanzel, officially<br>Claudio, officially<br>Henslee, officially<br>Yocum, officially |
| **Fourth Claim:** Facial First Amendment Challenge to Reference to Weapons Policy – Overbreadth – Injunctive and Decl. Relief | District<br>School |

---

[1] The District, Birhanzel, and Yocum are collectively referred to as the "District Defendants." The School, Henslee, and Yocum are the "School Defendants.

[2] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). *See also infra* Section C.4.

| CLAIM | DEFENDANTS |
|---|---|
| **Fifth Claim:** First Amendment Violation – Retaliation for Engaging in Protected Free Speech Activity | District<br>School<br>Birhanzel, officially and individually<br>Claudio, officially and individually<br>Henslee, officially and individually<br>Yocum, officially and individually<br>Danjuma, officially and individually |

Plaintiff filed a consolidated Response to the MTDs. Dkt. 84. Each Defendant group filed a Reply. Dkt. 94 (District Defendants); Dkt. 92 (School Defendants); Dkt. 90 (Danjuma). J.R. filed a Notice of Supplemental Authorities (Dkt. 98), and the Court permitted the District Defendants to file a Response to the Notice (Dkt. 101). The Court has reviewed all the briefing, the docket, and the relevant law. No hearing is necessary. The Court has jurisdiction under, *inter alia*, 28 U.S.C. § 1331.

## A. LEGAL PRINCIPLES

### 1.    Rule 12(b)(1)

Federal courts, as courts of limited jurisdiction, must have a statutory basis for their jurisdiction. *See Morris v. City of Hobart*, 39 F.3d 1105, 1111 (10th Cir. 1994) (citing *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994)). Under Federal Rule of Civil Procedure 12(b)(1), the court may dismiss a complaint for lack of subject matter jurisdiction. The determination of a court's subject matter jurisdiction is a question of law. *Madsen v. United States ex rel. U.S. Army, Corps of Eng'rs*, 841 F.2d 1011, 1012 (10th Cir. 1987). "A court lacking jurisdiction cannot render judgment but must dismiss the cause *at any stage* of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.,* 495 F.2d 906, 909 (10th

3

Cir. 1974).

A motion to dismiss for lack of subject matter jurisdiction may take two forms. *See Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). It may facially attack a complaint's allegations or it may challenge the facts upon which subject matter jurisdiction depends. *Id*. at 1002-1003.

> When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

*Id*. at 1003 (internal citations omitted); *see also Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir. 1987). "The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "The district court is given discretion in determining the procedure to employ in considering a motion to dismiss for lack of jurisdiction . . . ." *Fed. Deposit Ins. Corp. v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992) (quoting *Ten Mile Indus. Park v. Western Plains Serv. Corp.*, 810 F.2d 1518, 1524 (10th Cir. 1987)).

## 2.    Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual

4

allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124-25 (10th Cir. 2010) (internal citations omitted). But the Court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (cleaned up).

The *Twombly/Iqbal* pleading standard first requires the court to identify which allegations "are not entitled to the assumption of truth" because, for example, they state legal conclusions or merely recite the elements of a claim. *Id.* It next requires the court to assume the truth of the well-pleaded factual allegations "and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. In this analysis, courts "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). The standard is a liberal one, however, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

5

## B. FACTUAL BACKGROUND

Taking the well-pleaded factual allegations as true for purposes of analyzing the Motions, the Court discerns the following relevant facts.

When J.R. filed the AC, he was a seventh-grade student at the School for the 2023-24 school year. Dkt. 43, ¶14. The School is "a public charter school authorized by the [District]." *Id.* The District has "responsibility for the oversight and operation of local public and charter schools, including The Vanguard School." *Id.* at ¶15. Birhanzel is the Superintendent of the District, and Claudio is the Assistant Superintendent. *Id.* at ¶¶16-17. "Birhanzel is the highest level executive of Defendant School District. Her decisions, including the decision to ban J.R. from displaying his patches, represent official policies of Defendant School District." *Id.* at ¶100. Henslee is the Executive Director of the School, Yocum is its Director of Operations, and Danjuma is the former Assistant Principal. *Id.* at ¶¶19-21.

At all relevant times, J.R. placed various patches on his school backpack. *Id.* at ¶60. At the start of the school year, the patches included: (1) a monochrome American flag patch; (2) several patches of Pac Man ghosts holding firearms ("Ghost Patches"); (3) a patch displaying the words "Firearms Policy Coalition Official Member" with an image of a firearm (the "FPC Patch"); (4) a patch with the Dogecoin cryptocurrency logo; (5) a patch with the words "Bear Arms N' Bitcoin 2020;" (6) a "display of a person wearing an ATF cap looking over a wall;" and (7) a patch parodying the Gadsden Flag and containing a coiled snake on a red field with the

6

words "DON'T TELL ON ME" ("Parody Flag Patch"). *Id.* at ¶61. He later removed several of these patches and replaced them with others, to include: (1) a patch of the traditional Gadsden Flag; (2) a homemade banner stating "J-Rod 4 VP Revolution;" and (3) several patches depicting Saint Michael, a religious symbol, holding a sword. *Id.* at ¶63.

According to the AC, "J.R. sought to convey various messages through both his choice of specific patches to display and through the overall organization and arrangement of these elements on his backpack." *Id.* at ¶65. These messages include supporting the Firearms Policy Coalition (an advocacy organization focused on the Second Amendment), "the social utility of responsible firearm ownership, and his support for Second Amendment-protected freedoms," "his support for the right of Americans to self-manufacture [ghost guns],'" and "his bedrock political view that government should 'stay in its lane' and be limited to strictly necessary functions, so as to protect individual freedoms." *Id.* at ¶¶66-68; *see also id.* at ¶¶69-70.

"Although he rotates his patches from time to time, J.R. has generally displayed the same dozen or so patches or similar patches on his backpack for a number of years . . . ," including the two prior years he was a student at the School. *Id.* at ¶76. None of his "patches [caused] any disruptions inside or outside school or in any way impede[d] the educational mission of The Vanguard School during the 2022-23 or 2021-22 school years, much less cause a substantial disruption." *Id.* at ¶¶77, 79-80.

7

In August 2023, however, Defendants viewed J.R.'s patches as problematic. "A Dress Code, designated as Policy 'JICA' in the School District's policy manual, was in effect at the beginning of the . . . 2023-24 school year." *Id.* at ¶27. The District has had a dress code policy since 2013. *Id.* "[A] key provision of the code flatly prohibits students from displaying 'any . . . symbols, words, slogans, patches, or pictures that . . . [r]efer to . . . weapons' (the 'Reference to Weapons Policy')." *Id.* at ¶29. "The Reference to Weapons Policy prohibits any expression 'refer[ring]' to weapons whatsoever, without any consideration of the definition of a weapon . . . , or whether the particular expression could reasonably be deemed disruptive to the classroom environment, or the maintenance of a safe and orderly school." *Id.* at ¶30.

On August 3, 2023, Claudio presented a "Student and Staff Dress Code Policy Update" to the District's Board of Directors. *Id.* at ¶36. The presentation included several examples of dress code violations, including an image of the Gadsden Flag with the rationale, "Designer of the flag was Christopher Gadsden, a slave trader & owner of slaves. Reminder of the resentment of whites towards the slaves." *Id.* at ¶¶38, 40. "Claudio's presentation represents the official policy of Defendant District. Defendant District further ratified both Defendant Claudio's presentation and his later decisions to apply Defendant District's policies to bar J.R. from displaying certain expressive images on his backpack." *Id.* at ¶41.

Based on a "Charter School Contract establishing Defendant Districts' supervision and control over Defendant The Vanguard School, The Vanguard School

8

has a nominal exemption from the District's Dress Code policies." *Id.* at ¶42. But "any purported exemption is illusory. In actual practice, the Dress Code, including the Reference to Weapons Policy and the District's ban on politically disfavored messages such as the Gadsden Flag, applies with full force to The Vanguard School and all of its students." *Id.* at ¶43.

While J.R. had worn his patches in previous years, "[o]n or around August 18, 2023, less than a week after the start of the new school year, J.R. was summoned to the principal's office by Defendant Danjuma, and informed that an unidentified staff member had allegedly complained that his patches were inappropriate in some unspecified way." *Id.* at ¶84. J.R. then removed the Ghost Patches but kept the FPC Patch and the Parody Flag Patch. *Id.* at ¶85.

The following Monday, "J.R. was again summoned to the principal's office in reference to his patches" and told by Yocum "that the FPC patch was forbidden under the Reference to Weapons Policy." *Id.* at ¶86. Yocum emailed J.R.'s mother "a hyperlink to Defendant District's Dress Code, and specifically stated that the ban on patches or images that '[r]efer to . . . weapons' was being applied to J.R. pursuant to the District's policy." *Id.* At a meeting the same day, "while admitting that the FPC Patch was not disruptive, and that the school did not consider J.R. to represent a threat to anyone, Mr. Yocum opined that the 'images themselves are considered not safe to be in schools.'" *Id.* at ¶87. Yocum "understood that there were potentially free speech concerns at play, and that he would discuss the matter with counsel for the

District and/or The Vanguard School, and would get back to J.R. and his family with an official determination on the propriety of J.R.'s expression within a matter of days." *Id.* at ¶89.

Two days later, Yocum "relayed Defendants' official determination that J.R. was barred from displaying the FPC Patch. The decision was made jointly by Defendant The Vanguard School and Defendant School District." *Id.* at ¶90. They also barred the Parody Flag Patch. *Id.* Yocum "stated that he had consulted the school's attorney, as well as Defendant District. Defendant Yocum asserted that the patches were being barred because they could allegedly 'be deemed disruptive or potentially disruptive to the classroom environment.'" *Id.* at ¶91. Yocum told J.R. that he had to remove the FPC Patch and the Parody Flag Patch or he could not return to classes; J.R., however, did not comply. *Id.* at ¶¶92-93. Henslee then sent emails to J.R.'s mother demanding he remove the patches, which J.R. finally did. *Id.* at ¶¶94-95. "[T]he decisions to bar J.R. from displaying patches on his backpack were made by both The Vanguard School and the District acting jointly, notwithstanding the nominal exemption from the District Defendants' policies purportedly enjoyed by The Vanguard School." *Id.* at ¶44.

"On Monday, August 28, 2023, J.R. returned to school, having removed all of the patches Defendants previously barred." *Id.* at ¶97. "Partially to protest the censorship that he suffered, J.R. added the traditional Gadsden Flag Patch and two Saint Michael patches." *Id.* at ¶96. J.R. was again pulled from classes into the

10

principal's office. *Id.* at ¶98. His mother "was called to an emergency meeting at the school, during which Defendant Danjuma relayed that the District Superintendent (Defendant Birhanzel) had determined that the Gadsden Flag was unacceptable under the Dress Code." *Id.* at ¶99. "The sole rationale for Defendants' ban on display of the Gadsden Flag was, in Defendant Danjuma's words, 'due to its origins [in] slavery and the slave trade.' Defendant Danjuma further stated 'we can't have [the Gadsden Flag] in and around other kids.'" *Id.* at ¶102. "J.R. was not allowed to return to class for the remainder of the day." *Id.* at ¶107.

After the end of the school day, Yocum sent an email to elaborate on Defendants' reasons for barring J.R.'s Gadsden Flag patch. *Id.* at ¶108. In his email, Yocum,

> cited to articles by advocates arguing that the Gadsden Flag was "[t]ied to" various contemporary political movements disfavored by the articles' authors. The articles, in turn, decried the purported link between the Gadsden Flag and such things as "hard-line Republican anti-tax movement[s]," and "political protests . . . opposing restrictions on gun ownership and objecting to rules imposed in 2020 to slow the spread of the coronavirus." Some of the articles also noted that the originator of the Flag, Christopher Gadsden, owned slaves and was involved in the slave trade in the 18th Century. According to Defendant Yocum, in the present day, the flag is also "tied to" what he called "'Patriot' groups" and "other white-supremacy [and . . .] hate groups."

*Id.* Yocum "had been coordinating with Defendant Claudio." *Id.* at ¶118. And "Defendants' rationale was arrived at jointly" by the School Defendants and District Defendants. *Id.* at ¶109.

Other students at the School and other District schools regularly express

11

themselves by displaying symbols, words, slogans, patches or pictures. For example, "students regularly display patches or other accessories concerning lesbian, gay and bisexual students. Additionally, students regularly display patches or other accessories expressing views on the topic of climate change." *Id.* at ¶46. Staff at the School and other District schools do the same. For example, "staff members prominently display bumper stickers with strong political and other messages on automobiles parked on school property." *Id.* at ¶48.

After J.R.'s mother's meeting with Danjuma, video of the meeting circulated on social media. *Id.* at 133. The School then "issued a statement 'recogniz[ing] the historical significance of the Gadsden flag and its place in history.' The statement also asserted that '[a]t this time, the Vanguard School Board and the District have informed the student's family that he may attend school with the Gadsden flag patch visible on his backpack.'" *Id.* at ¶137. But "Claudio has never provided assurances that J.R. would be free from further censorship targeting the Gadsden Flag Patch. To the contrary, Defendant Claudio explicitly reserved the right to once again bar display of the patch. Defendant Claudio informed Ms. Rodriguez that Defendants were temporarily allowing J.R. to wear the patch, stating they would continue to allow the patch 'until [they receive a complaint] from [a] student or staff member.'" *Id.* at ¶139. Further, "Defendants have not lifted their ban on the FPC Patch, the Ghost Patches, or the Parody Flag Patch." *Id.* at ¶140.

J.R. has resumed wearing the Gadsden Flag patch, the Ghost Patches, and the

12

FPC Patch. *Id.* at ¶¶143-44. But the AC asserts "Defendants['] forbearance is only temporary and will be reversed as soon as Defendants deem it expedient to do so." *Id.* at ¶144.

Following the media spotlight on J.R. and the Defendants, other students at the School have verbally and physically harassed J.R. *Id.* at ¶145. Defendants have failed to intervene to address this harassment and intimidation despite being informed of these incidents. *Id.* at ¶147. J.R. has also reported to school officials that other students have stolen patches from his backpack, including the Gadsden Flag patch, but Defendants "have failed to investigate or intervene to prevent or redress this misconduct." *Id.* at ¶148.

## C. ANALYSIS

### 1.    The District's and School's Challenge to Plaintiff's Standing[3]

---

[3] As an initial matter, the District MTD includes a contract between the District and School ("School Contract") in its appendix. Dkt. 53-1, pp.1-22. Those Defendants then cite to provisions of the School Contract in support of their arguments. They further argue that the Court may consider the School Contract because "a court is permitted to review the complaint, its attachments, and documents incorporated into the complaint by reference." Dkt. 53, p.4 n.2. But they do not explain where or how J.R. incorporated or relied on the School Contract in his AC. To the contrary, the AC states only, "On information and belief, pursuant to a Charter School Contract establishing Defendant Districts' supervision and control over Defendant The Vanguard School, The Vanguard School has a nominal exemption from the District's Dress Code policies." Dkt. 43, ¶42. J.R.'s single allegation made "on information and belief" is insufficient for the Court to consider the School Contract for purposes of the District's or any other parties' Rule 12(b)(6) arguments. *See Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013). But the Court does consider the School Contract in its analysis of the Rule 12(b)(1) and standing arguments. *See Holt*, 46 F.3d at 1003.

"The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Article III standing is a "bedrock constitutional requirement." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)). Article III of the Constitution limits the federal courts' jurisdiction to "Cases" and "Controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). Because Article III standing is an issue of a court's jurisdiction, a court must first satisfy itself that it exists. *Kerr v. Polis*, 20 F.4th 686, 692 (10th Cir. 2021). Therefore, a plaintiff must establish Article III standing by demonstrating: "(1) an injury in fact; (2) a causal connection between the injury and the challenged action; and (3) a likelihood that a favorable decision will redress the injury." *Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011) (citing *Friends of Earth Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000)).

---

Similarly, in his Response, J.R. attaches and cites to a discovery hearing transcript and several documents produced in discovery. Dkt. 84, p.35-36; Dkts. 84-2 through 84-9. When analyzing the Motions to Dismiss, the Court is limited to the factual allegations contained in J.R.'s AC. His proffered exhibits and arguments based on them are beyond the AC and the Court does not consider them. *See Abdulina v Eberl's Temporary Servs., Inc.*, 79 F. Supp. 3d 1201, 1206-07 (D. Colo. 2015) (citations omitted) ("Plaintiff, however, cannot amend [his] complaint by adding factual allegations in response to Defendant's motion to dismiss.").

14

The District argues J.R. lacks standing to assert his third and fourth claims for relief, which seek injunctive and declaratory relief. While its standing arguments are less than clear, it appears to challenge the causation and redressability prongs based on its theory that it had no authority to dictate the School's dress code. Dkt. 53, p.19. But the Court finds the AC contains sufficient factual allegations to plausibly establish J.R.'s standing.

The AC alleges Claudio presented a Student Dress Code update reflecting the District's official policy and the Gadsden flag as an example of a dress code violation. Dkt. 43, ¶¶36, 38, 41. It further alleges that based on the School Contract, the District has "supervision and control" over the School; and while the School had a "nominal exception" from the District's dress code policy, that exception is "illusory." *Id.* at ¶¶42-43. Instead, it alleges that "[i]n actual practice, the Dress Code, including the Reference to Weapons Policy and the District's ban on politically disfavored messages such as the Gadsden Flag, applies with full force to [t]he Vanguard School and all of its students." *Id.* at ¶43. And he plausibly alleges the District and School coordinated their decisions to enforce the dress code against J.R. and bar his patches. These allegations suffice to establish the causation and redressability prongs to support J.R.'s standing.

Despite its arguments, the School Contract does not support the District's Rule 12(b)(1) contentions. While the contract identifies the District's JICA Policy (student dress code) as a policy that is waived for the School, it also provides the policy is

15

waived "subject to all other terms and conditions of this Agreement." Dkt. 53, ECF pp.11, 19. In Section 3.2, the contract inconsistently requires the School to establish its own dress code while also making the obligation optional. *Id.* at p.2. (*compare* "Vanguard agrees that it shall . . . develop its own discipline and dress code policies" *with* "Vanguard may adopt its own code of conduct for students and shall be granted a waiver from corresponding District policies as long as the developed codes, policies and procedures regarding student conduct and student discipline are in compliance with applicable federal and state laws . . ."). And the contract does not plainly demonstrate a clear delegation of authority to the School. *Cf. id.* ("Vanguard shall agree to enforce a standard of conduct that requires all faculty and staff to conduct themselves in a manner . . . which does not cause, in the District's view, a public embarrassment . . . .").

What is missing under the District's theory are factual allegations or evidence that the School developed its own dress code or voluntarily adopted the District's dress code. In short, at this stage of the case, the School Contract alone does not support that the District had no authority over the dress code that allegedly infringed J.R.'s First Amendment rights. On the current record, the Court is satisfied of J.R.'s standing to assert all his claims.[4]

---

[4] The fact that the School District apparently concedes J.R.'s standing for his second claim seems to contradict its argument that he lacks standing for his third and fourth claims.

16

The School similarly argues J.R. lacks standing for his fourth claim for relief as asserted against it. In his response, however, J.R. indicates he "does not oppose the School's motion with respect to Claim 4." Dkt. 84, ECF p.58 n.19. Thus, the School MTD is granted regarding Claim 4 as against the School.

### 2.    Whether the District's Changed Student Dress Code Has Mooted J.R.'s Third and Fourth Claims

The District also argues the Court lacks subject matter jurisdiction over J.R.'s third and fourth claims for relief because the District has since modified its dress code and thus mooted those claims. The Court disagrees.

The doctrine of mootness is grounded in Article III's limitation on the subject matter jurisdiction of federal courts. *See* U.S. Const. art. III, § 2, cl. 1. "Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996). "The mootness doctrine provides that although there may be an actual and justiciable controversy at the time the litigation is commenced, once that controversy ceases to exist, the federal court must dismiss the action for want of jurisdiction." *Jordan v. Sosa*, 654 F.3d 1012, 1023 (10th Cir. 2011) (citing 15 James W. Moore & Martin H. Redish, Moore's Federal Practice § 101.90, at 101–237 (3d ed. 2010)). Put another way, "[m]ootness is 'standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Prison Legal News v. Fed.*

*Bureau of Prisons*, 944 F.3d 868, 879 (10th Cir. 2019) (quoting *Brown v. Buhman*, 822

F.3d 1151, 1164 (10th Cir. 2016)).

"An action becomes moot '[i]f an intervening circumstance deprives the

plaintiff of a personal stake . . . at any point.'" *Id.* at 880 (quoting *Brown*, 822 F.3d at

1165). "But an action is not moot if a plaintiff has 'a concrete interest, however small,

in the outcome.'" *Id.* (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S.

298, 307-08 (2012)).

"Under the 'voluntary cessation exception' to mootness, 'a defendant cannot

automatically moot a case simply by ending its unlawful conduct once sued.'" *Prison*

*Legal News*, 944 F.3d at 880 (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91

(2013)). "This rule is designed to prevent gamesmanship." *Brown*, 822 F.3d at 1166.

But "[a] defendant's voluntary cessation may moot a case, [ ] if the defendant carries

'the formidable burden of showing that it is absolutely clear the allegedly wrongful

behavior could not reasonably be expected to recur.'" *Id.* at 1166-67 (quoting *Already*,

568 U.S. at 91. "The Supreme Court has described this burden as 'heavy,' and

'stringent.'" *Id.* (citations omitted).

"In practice, this heavy burden frequently has not prevented governmental

officials from discontinuing challenged practices and mooting a case." *Id.* at 1167

(quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1116) (cleaned up). "Courts may

accord 'more solicitude' to government officials' claims that their voluntary conduct

moots a case." *Prison Legal News*, 944 F.3d at 881 (citing *Rio Grande Silvery Minnow*,

601 F.3d at 1116 n.15). This solicitude is not automatic. *Id.* "But 'government self-correction provides a secure foundation for mootness so long as it seems genuine.'" *Id.* (quoting *Brown*, 822 F.3d at 1167-68). "Most cases that deny mootness following government officials' voluntary cessation 'rely on *clear showings* of reluctant submission [by governmental actors] and a desire to return to the old ways.'" *Brown*, 822 F.3d at 1167 (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1116) (emphasis in original). "[I]n the government enforcement context, [the Tenth Circuit has instructed] 'not [to] require some physical or logical impossibility that the challenged policy will be reenacted absent evidence that the voluntary cessation is a sham for continuing possibly unlawful conduct.'" *Id.* (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1117-18).

Here, the District argues it has changed its student dress code. Dkt. 53, p.21 ("Given that the School District has amended its dress code policy and eliminated its prohibition on the display of weapons, a policy that J.R. does not challenge, there is no longer a live controversy . . . ."). It submitted an affidavit from Birhanzel to support its argument:

> On December 11, 2023, the Executive Leadership Team [of the District] met to conduct its regularly assigned duties. During this meeting, we reviewed District Policy JICA, and we decided via consensus to amend the policy in order to avoid legal challenges and future litigation. The Executive Leadership Team revised Policy JICA to remove the District's dress code ban of students adorning any article of clothing or accessory that showed and/or referenced weapons. Among other revisions to District Policy JICA, we decided to replace the reference to weapons ban with language approved of by the U.S. Supreme Court and taken

19

> directly from its decision in *Tinker v. Des Moines Independent Community School District*, 939 U.S. 503 (1953). On December 19, 2023, the Executive Leadership Team published the School District's revised Policy JICA via the School District's website which reflects the applicable dress code policy in place at the School District.

Dkt. 53-1, ECF p.27, ¶5. It also provided the December 19, 2023 version of the District Policy JICA, which states the following items are appropriate: "Clothing, paraphernalia, . . . accessories, . . . that are or contain any advertisement, symbols, words, slogans, patches, or pictures that are free from: 1. References to drugs, tobacco, alcohol, or messages or images that might reasonably forecast a substantial disruption of or material interference with school activities." *Id.* at ECF p.23. This version deleted the prior prohibition on items with references to weapons. *Compare id. and* Dkt. 43-2. Further, Birhanzel's affidavit states:

> Since December 19, 2023, I attest that there has been no prohibition on students wearing clothing or accessories displaying or referencing weapons at District schools pursuant to Policy JICA. * * * I attest that the School District . . . has no intention to reimpose a dress code ban on displaying or referencing weapons at school as previously articulated within prior versions of District Policy JICA.

Dkt. 53-1, ECF p.27, ¶6. She additionally attests, "the Gadsden flag is not banned pursuant (sic) in either the prior or current versions of District Policy JICA. Rather, pursuant to District Policy JICA, a student's display of the Gadsden flag will only be prohibited if a school administrator shows that such display 'reasonably forecast[s] a substantial disruption of or material interference with school activities.'" *Id.* at ECF p.28, ¶7.

20

At first blush, Birhanzel's affidavit and the revised JICA policy appear to moot J.R.'s claims for injunctive and declaratory relief. But, since her affidavit explains that the District published the revised policy on the District's website, the Court reviewed the currently available version of that policy on the website. *See O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web."). The Court's review reveals the District has either revised the policy further since December 19, 2023, or never updated the published policy with the December 19 version. *See* Harrison School District 2, Code of Conduct 2024-2025, Student Dress Code, Policy JICA *available at* https://www.hsd2.org/families/code-of-conduct (last accessed Apr. 17, 2025). This latest published version continues to expressly prohibit items that display or reference weapons. *Id.*; *compare with* Dkt. 43-2.

"For voluntary cessation to moot a case, [the Court] must be convinced that 'the allegedly wrongful behavior could not *reasonably* be expected to recur.'" *Brown*, 822 F.3d at 1175 (quoting *Already*, 568 U.S. at 91). The Court is not convinced here because the District appears to have returned to the allegedly wrongful behavior by either never publishing the updated policy or revising it again after December 2023 to reinstate the objectionable language. Thus, assuming *arguendo* that the December 19, 2023 policy mooted J.R.'s third and fourth claims against the District, the Court finds the currently published policy raises serious questions about whether the District's purported revisions were genuine. *See Brown*, 822 F.3d at 1167. In short,

21

the District has failed to meet its "heavy" and "stringent" burden to show that its claimed voluntary cessation moots J.R.'s claims.[5] These claims shall proceed against the District.

### 3.    J.R.'s Second Claim Survives the Motions to Dismiss

Both the District and School argue J.R.'s second claim, alleging *Monell* liability under 42 U.S.C. § 1983 for violations of his right to free speech, fails under Rule 12(b)(6). Neither argues J.R. has alleged insufficient allegations to plead this claim. Their arguments instead appear to focus on the two entities finger-pointing at the other, which only suggests there are evidentiary issues that do not warrant dismissal of this claim.

It is long-standing precedent that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676 (citing *Monell*, 436 U.S. at 691); *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (A governmental entity "can be found liable under § 1983 only where the municipality itself causes the constitutional

---

[5] The Court is troubled by the inaccuracy of Birhanzel's affidavit and the currently published JICA policy. *See* Brown, 822 F.3d at 1171 (sworn declaration submitted by government official explaining policy change that mooted plaintiff's claims is persuasive because "violation of the declaration would expose [the government official] to prosecution for perjury or contempt."). The Court recognizes, however, that the currently published policy does not necessarily demonstrate Birhanzel's affidavit executed on January 31, 2024, was false at the time. To the extent those facts changed after execution of the affidavit, however, the District should have brought it to the Court's and Plaintiff's attention. Either way, the matter is troubling.

violation at issue.") (citing *Monell*, 436 U.S. at 694-95, 698); *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) ("It is well established . . . that a municipality cannot be held liable under section 1983 for the acts of an employee if [the] employee committed no constitutional violation."). "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010) (internal quotation marks and citations omitted); *Schneider v. City of Grand Junction Police Dep' t*, 717 F.3d 760, 769 (10th Cir. 2013) ("[T]he Supreme Court require[s] a plaintiff to show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.").

To establish municipal liability under *Monell*, a plaintiff must show (1) a municipal employee committed a constitutional violation and (2) a municipal policy or custom was the moving force behind the violation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). An official policy or custom under *Monell* may take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions–and the basis for them–of subordinates to whom authority was delegated subject to these

23

policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (cleaned up).

The District argues the School Contract between it and the School demonstrates the District had no authority over the School's dress code. But as explained above, on a Rule 12(b)(6) motion, the Court generally cannot consider documents beyond the complaint.[6] *See, supra,* § C.1. And the same holds true for the School. While the School argues it has no liability under *Monell* because the individual School Defendants were not final policy makers, its argument is the other side of the same coin—the School Defendants argue that none of them had discretion over enforcement of the school dress code because enforcement was dictated by the District.

What these arguments ignore are the allegations in the AC, which is necessarily the focus of a Rule 12(b)(6) motion. Concerning the District, the AC alleges, for example, that Birhanzel's decisions included "the decision to ban J.R. from displaying his patches, represent[ing] official policies of [the] School District." Dkt. 43, ¶100. And Claudio made a presentation on the 2023-24 District dress code that represented the District's official policy and included the Gadsden flag as an

---

[6] *See, supra,* n.3. But even when the Court considered the School Contract in context of the District's standing challenge, the Court found the School Contract is not as clear as the District argues. *See, supra,* § C.1.

example of a display that violated that policy; "Defendant District further ratified both Defendant Claudio's presentation and his later decisions to apply Defendant District's policies to bar J.R. from displaying certain expressive images on his backpack." *Id.* at ¶¶38, 41.

Concerning the School, J.R. asserts that while it "has a nominal exemption from the District's Dress Code policies," "any purported exemption is illusory [because, in] actual practice, the Dress Code, including the Reference to Weapons Policy and the District's ban on politically disfavored messages such as the Gadsden Flag, applies with full force to The Vanguard School and all of its students." *Id.* at ¶42-43. The AC further plausibly alleges the decisions to bar his patches "were made by both The Vanguard School and the District acting jointly . . . ;" Yocum emailed J.R.'s mother "a hyperlink to Defendant District's Dress Code, and specifically stated that the ban on patches or images that '[r]efer to . . . weapons' was being applied to J.R. pursuant to the District's policy;" Yocum also said that he would consult "with counsel for the District and/or The Vanguard School . . . ;" the decision barring J.R. from displaying the FPC Patch "was made jointly by Defendant The Vanguard School and Defendant School District;" Danjuma, in a meeting with J.R. and his mother, "relayed that the District Superintendent (Defendant Birhanzel) had determined that the Gadsden Flag was unacceptable under the Dress Code;" and "Defendants' rationale was arrived at jointly by The Vanguard School Defendants, including Defendant Yocum, Defendant Danjuma, and Defendant Henslee, and by The District

25

Defendants, including Defendant Claudio and Defendant Birhanzel." *Id.* at ¶¶ 44, 86, 898, 90, 99, 109.

In short, J.R. alleges numerous instances of one, the other, or both the District or School acting in concert or of their own accord to deprive J.R. of his constitutional rights. Thus, at this stage of the case, the Court rejects the District's argument that it had no authority over the school dress code that J.R. alleges suppressed his free speech. And the Court rejects the School's similar argument for the same reasons noted above.

### 4.     J.R.'s Third Claim Survives the School MTD

J.R. also brought his third claim seeking injunctive relief and declaratory judgment for as-applied violations of his free speech against Birhanzel, Claudio, Henslee, and Yocum, in their respective official capacities as employees of either the District or School. But as the School MTD points out, "There is no longer a need to bring official-capacity actions against local government officials [because] local government units can be sued directly." Dkt. 51, p.18 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). Meaning, suing Henslee in her official capacity, for example, is the same as suing the School. Thus, J.R.'s third claim is dismissed as to Birhanzel, Claudio, Henslee, and Yocum, in their official capacities since J.R. has sued the governmental units directly.

This brings the Court to the School's argument for dismissal of the third claim against it directly. But the School's arguments for dismissal of this claim are woefully

26

underdeveloped. The School makes only cursory arguments that J.R. has not

sufficiently alleged municipal liability for "his First Amendment Claims." *Id.* at p.17.

But, as with his second claim for relief, the Court finds J.R. has alleged sufficient

facts to plausibly allege, at this stage, liability by the School on this claim for relief.

*See, supra,* § C.3, *and infra,* § C.5.

### 5.    J.R.'s First Claim Against the Individual Defendants, Individually

J.R. alleges his first claim for relief, asserting as-applied violations of his right

to free speech, against each individual Defendant in their individual capacity. Each

individual Defendant argues they are entitled to qualified immunity.

The First Amendment guarantees freedom of speech and applies to the states

through the Due Process Clause of the Fourteenth Amendment. *See, e.g., Gitlow v.

New York*, 268 U.S. 652, 666, (1925). Students and teachers do not "shed their

constitutional rights to freedom of speech or expression at the schoolhouse gate."

*Tinker v. Des Moines Indep. Comm'y Sch. Dist.*, 393 U.S. 503, 506 (1969). But "the

constitutional rights of students in public schools are not automatically coextensive

with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478

U.S. 675, 682 (1986). Schools must be given authority "consistent with fundamental

constitutional safeguards, to prescribe and control conduct in the schools." *Tinker*,

393 U.S. at 507.

27

"Restrictions on student speech in public schools are analyzed under one of two standards." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 35-36 (10th Cir. 2013) (citing *Corder v. Lweis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1225 (10th Cir. 2009). Private student speech is analyzed under the more stringent *Tinker* standard, whereas school-sponsored speech is governed by *Hazelwood Sch. Dist. V. Kuhlmeier*, 484 U.S. 260 (1988). *Taylor*, 713 F.3d at 36 (citation omitted).

"Under *Tinker,* a public school may not restrict private student expression unless the school reasonably forecasts it 'would materially and substantially interfere with the requirements of appropriate discipline in operation of the school,' or 'impinge upon the rights of other students.'" *Id.* (quoting *Tinker*, 393 U.S. at 505-06). Further, an "'undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression,' and 'the mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint cannot justify the prohibition by school officials of a particular expression of opinion.'" *Thomas v. Ragland*, 23 F.4th 1252, 1258 (10th Cir. 2022) (quoting *Seamons v. Snow*, 84 F.3d 1226, 1237 (10th Cir. 1996)). The Supreme Court has excepted three scenarios from the *Tinker* analysis–(1) sexually explicit, indecent, or lewd speech, (2) school-sponsored speech analyzed under the *Hazelwood* analysis, and (3) speech promoting illegal drug use. *Id.* at 1257 (citations omitted).

Here, each of the Individual Defendants assert qualified immunity. Qualified immunity shields individual defendants in Section 1983 actions unless their conduct

28

was unreasonable based on clearly established law. *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). "[W]hen a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id.* (quotation omitted). The Court has discretion to consider these prongs in any order. *Leverington v. City of Colo. Springs*, 643 F.3d 719, 732 (10th Cir. 2011). Whether a defendant is entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).

As to the first prong, "[i]f no constitutional right would have been violated were the allegations established," the inquiry is at an end. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second prong—whether the right was clearly established—must be considered "in light of the specific context of the case, not as a broad general proposition." *Id*. An official's conduct "violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing is violating that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

"To show that the law is clearly established, a plaintiff must normally point to a 'Supreme Court or Tenth Circuit decision on point, or the clearly established weight

29

of authority from other courts.'" *Jordan v. Jenkins*, 73 F.4th 1162, 1168 (10th Cir. 2023), *cert. denied sub nom. Donnellon v. Jordan*, 144 S. Ct. 1343, 218 L. Ed. 2d 421 (2024) (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007)). "The degree of specificity required from prior case law depends in part on the character of the challenged conduct. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) (citations omitted). "In the rare obvious case, though, 'the unlawfulness of the [government actor's] conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Jordan*, 73 F.4th at 1168 (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1053 (10th Cir. 2018)).

"The procedural posture of the qualified-immunity inquiry may [also] be critical." *Thompson*, 23 F.4th at 1256. Because the qualified immunity analysis is a "fact-bound inquiry[,]" asserting the defense "via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014)). "On a motion to dismiss, 'it is the defendant's conduct *as alleged in the complaint* that is scrutinized for [constitutionality].'" *Id.* (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)).

The Court finds, under *Tinker*, the AC plausibly alleges each of the Individual Defendants violated J.R.'s First Amendment rights.[7] For example, the AC alleges the weapons reference in the dress code did not consider "whether the particular expression could reasonably be deemed disruptive to the classroom environment, or the maintenance of a safe and orderly school." Dkt. 43, ¶30. Further, none of J.R.'s patches disrupted the classroom or the maintenance of a safe and orderly school during the 2022-23 or 2021-22 school years, and Yocum admitted that at least the "the FPC Patch was not disruptive . . . ." *Id.* at ¶¶77-80, 87. Yet, after Yocum consulted the School's attorney and the District, he switched course and told J.R. the FPC Patch and the Parody Flag Patch could "be deemed disruptive or potentially disruptive to the classroom environment." *Id.* at ¶91. Nevertheless, J.R. alleges no Defendant made any assessment that displays of his patches would be reasonably likely to disrupt classes at the School. *Id.* at ¶¶120-30; *see also id.* at ¶169. Thus, as

---

[7] Birhanzel and Claudio misperceive J.R.'s claim against them as being predicated on a theory of supervisory liability theory, but J.R. disclaims that theory. Dkt. 53, pp.15-18; Dkt. 84, p.32 n.14. They also argue neither had "any legal authority to direct, control, or participate in Vanguard and/or its employees' decisions affecting J.R. . . ." Dkt. 53, p.16-17 n.6. But the Court has already rejected this argument. *See, supra,* § C.1. Henslee and Yocum argue that *Tinker* is not the right standard and instead suggest the Supreme Court's reasoning in *Morse* is more appropriate. Dkt. 51, pp.13-17. But in *Morse*, the Supreme Court held that student speech promoting illegal drug use is a carve-out to the usual *Tinker* analysis. *Morse*, 551 U.S. at 403, 408-09; *see also Thompson*, 23 F.4th at 1257. This case, however, does not involve speech about illegal drug use, and thus *Tinker* provides the correct standard. *See Taylor*, 713 F.3d at 36 (*citing Morse*, 551 U.S. at 406-06).

alleged, J.R. plausibly states violations of his First Amendment rights under the *Tinker* standard.

To be sure, the AC alleges each of the Individual Defendants took action that led to these violations. Birhanzel decided to ban J.R. from displaying his patches. *Id.* at ¶100. Claudio was involved in the decision to ban J.R. from displaying the Gadsden Flag. *Id.* at ¶¶36-41. Claudio and Yocum coordinated around the decision to bar one or more of J.R.'s patches. *Id.* at ¶¶114-18. Henslee sent e-mails to J.R.'s mother "reiterating Defendants' demand that J.R. remove the FPC and Parody Flag Patches, and threatening that '[i]f he returns to school with any unacceptable patches, he will be sent to the front office until they are removed.'" *Id.* at ¶94. Yocum explained to J.R. that the FPC Patch was prohibited under the dress code and later emailed the same to J.R.'s mother along with the position that the Parody Flag Patch was similarly banned. *Id.* at ¶¶86, 90. Yocum further "instructed that if J.R. did not remove the FPC Patch and the Parody Flag Patch, he would not be allowed to attend classes." *Id.* at ¶92. The first week of school, Danjuma informed J.R. that certain of his original patches needed to be removed. *Id.* at ¶84. And she told J.R.'s mother that the Gadsden Flag was unacceptable under the dress code according to Birhanzel. *Id.* at ¶99. She explained, "we can't have [the Gadsden Flag] in and around other kids," and that the flag had "its origins [in] slavery and the slave trade." *Id.* at ¶102. Ultimately, "Defendants' rationale [for banning display of the Gadsden Flag] was arrived at jointly by The Vanguard School Defendants, including Defendant Yocum,

32

Defendant Danjuma, and Defendant Henslee, and by The District Defendants, including Defendant Claudio and Defendant Birhanzel." *Id.* at ¶109. Based on these allegations, J.R. has plausibly pleaded each Individual Defendant violated his First Amendment rights.

And the Court finds J.R.'s rights were clearly established. Since the Supreme Court's decision in *Tinker*, it has been clearly established that

> In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained.

*Tinker*, 393 U.S. at 509 (quoting *Burnside v. Byers* 363 F.2d 744, 749 (1966). Here, there are no allegations in the AC, and an insufficient showing by the Individual Defendants, that their alleged violation of J.R.'s First Amendment rights was based on facts which might reasonably have led school authorities to forecast substantial disruption of, or material interference with, school activities or any showing that disturbances or disorders on school premises in fact occurred when J.R. displayed his patches. *Id.* at 514. Instead, the AC plausibly alleges the Individual Defendants "banned and sought to punish [J.R.] for a silent passive expression of opinion,

33

unaccompanied by any disorder or disturbance" on his part, which *Tinker* has precluded since 1969.[8] *Id.* at 508.

Consequently, the Court does not find the Individual Defendants are entitled to qualified immunity based on the current record.[9]

### 6.    J.R.'s Fifth Claim Against All Defendants

Lastly, J.R. alleges a First Amendment retaliation claim against all Defendants. To state a claim for First Amendment retaliation, he must plead facts to plausibly allege the following elements: (1) he engaged in constitutionally protected activity; (2) Defendants' actions caused him to suffer an injury that would chill a person of ordinary firmness from engaging in the protected activity; and (3) Defendants' actions were substantially motivated as a response to the protected activity. *See Hyberg v. Enslow*, 801 F. App'x 647, 651 (10th Cir. 2020). J.R. must also "establish a 'causal connection' between the [Defendants] 'retaliatory animus' and [J.R.'s] 'subsequent injury.'" *See Hall v. Brown*, No. 22-4080, 2023 WL 7014046, at *5

---

[8] Further, since *Tinker* other courts outside of the Tenth Circuit have found displays of firearm images on students' clothing are constitutionally protected. *See Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 252, 259, 261 n.10 (4th Cir. 2003); *Burnham v. Ianni*, 119, F.3d 668, 676 n. 13 (8th Cir. 1997); *Schoenecker v. Koopman*, 349 F. Suppp. 3d 745, 747, 752-54 (E.D. Wis. 2018); *Griggs v. Ft. Wayne Sch. Bd.*, 359 F. Supp. 2d 731, 732-33 (N.D. Ind. 2005).

[9] The Court's decision today does not foreclose Defendants from reasserting a qualified immunity defense at the summary judgment phase. *See Seamons*, 84 F.3d at 1238 (citing *Behrens*, 516 U.S. at 299).

(10th Cir. Oct. 25, 2023) (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)). The retaliatory animus must be the "but-for cause of [their] injury, meaning that the adverse action against [him] would not have been taken absent the retaliatory motive." *Id.* (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)) (internal quotation marks omitted).

The difficulty for J.R. on this claim for relief is he group pleaded his allegations. *Carrado v. Daimler AG*, No. 17-cv-3080-WJM-SKC, 2018 WL 4565562, at *3 (D. Colo. Sept. 24, 2018) (group pleading violates Rule 8). Nowhere does he identify who did what to him in the name of unlawful retaliation. *See* Dkt. 43, ¶¶145-49, 226-239. And this is beside the point of this claim being asserted against the Individual Defendants in their official capacities, which is redundant since J.R. has also sued the entities. His fifth claim is therefore dismissed.

*      *      *

For the reasons shared above, the Court ORDERS the following:

1. All three Motions to Dismiss (Dkts. 51, 52, and 53) are GRANTED IN PART and DENIED IN PART;

2. the third and fifth claims for relief as against Birhanzel, Claudio, Henslee, Yocum, and Danjuma, in their official capacities, are DISMISSED WITH PREJUDICE;

3. the fourth claim for relief as against the School is DISMISSED WITHOUT PREJUDICE;

35

4. the fifth claim for relief as against the School and District is DISMISSED
   WITHOUT PREJUDICE;

5. the surviving claims for relief are as follows: first claim for relief against
   Birhanzel, Claudio, Henslee, Yocum and Danjuma, all individually; second
   claim for relief against the School and District; third claim for relief against
   the School and District; and the fourth claim for relief against the District;
   and

6. The parties are ORDERED to contact the Chambers of Magistrate Judge
   Dominguez Braswell within 7 days concerning the discovery stay and the
   next steps for this action.

DATED: April 18, 2025.

BY THE COURT:

S. Kato Crews
United States District Judge

36